RECEIVED

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISON

AUG – 7 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

In re Scott R Foster )

Plaintiff/Petitioner )

V )

Illinois Appellate Court First District Second )

Division Justices Mary Anne )

Mason, Aurelia Pucinski, Michael B Hyman

1:19-cv-05321
Judge John Robert Blakey
Magistrate Judge Young B. Kim

## Writ of Mandamus Pursuant to the American Disabilities Act
42 § US. Code. 12101

Now comes Plaintiff/Petitioner Pro Se Scott R Foster and pursuant to Federal Rule 21 states as follows:

1) This Writ of Mandamus seeks that this honorable court order Justices Mary Anne Mason, Aurelia Pucinski, and Michael B Hyman of the Appellate Court of Illinois (First District Second Division ) to accept the initial brief that Foster has ready to be filed, review the issues in that brief, and ultimately rule of the issues raised in Foster's appellate brief to that court.

2) All relevant issues pertaining to that appeal and the denial of the appeal because Foster was not allowed to file his appellate brief are included in the PLA (Petition for Leave to Appeal) that was filed with the Illinois Supreme Court, which is attached hereto as Exhibit 1. Please note that the copy of the PLA that is in Exhibit 1 is time stamped on the first page and has the case number assigned by the Illinois Supreme Court at the top of each page.

3) Therefore, the American Disabilities Act is the relevant law under which Foster is seeking the Writ of Mandamus.

4) Because the PLA is so well written, Foster sees no reason to present any additional argument or pleading in this matter. Indeed. It would be disingenuous of Foster to advance any additional argument other than that which he has already made. Rather Foster asks that this court incorporate Exhibit 1 into this complaint and do what is required to be done in every court in this country—READ and comprehend each page of what Foster has submitted to this court. (Foster is a first rate writer who works very hard on his legal filings.)

5) As can be seen from reading the PLA, Foster raised a separate issue apart from the issue that is presented here which pertains only to ADA.

6) As a result, Foster could not and did not appeal the issue pertaining to ADA directly to this Federal District Court. But instead he filed his PLA with the Illinois Supreme Court and denial of the PLA date is November 28,2018 (Exhibit 2); (Please note that there was a subsequent denial of a Motion to Reconsider the PLA, which was denied by the Illinois Supreme Court on March 5, 2019, but in that Motion Foster expressly waived the issue of the ADA portion of that appeal. Therefore, it is Foster's position that the filing of the PLA and its subsequent denial tolled the six month statute of limitations in filling an FDA claim. Furthermore, it is Foster's position that the 300 day "good cause" statute of limitations for filing an FDA claim is relevant in this matter because of Foster's clear ongoing hardships, which are documented in his Affidavit of Hardship that is attached as Exhibit 3. In that Affidavit Foster makes clear the extraordinary financial and emotional hardship that he and his 15-year-old daughter have continuously suffered daily for what

will soon be a decade as the result of an unquestionably illegal foreclosure, which is at

the core of this case. These extraordinary circumstances, which revolve around the very

hell hole of a life that both he and his daughter live daily are the direct result of Foster

having had the integrity to fight what was clearly an illegal foreclosure on what was

perhaps the nicest single floor condo in all of Rogers Park that was on perhaps the nicest

cul de sac street in Rogers Park and was truly a mere 200 feet from the edge of Lake

Michigan wherein Foster had approximately $150,000 in equity given the value of his

property and the amount on the mortgage!!!! Between working for Uber and working on

legal issues, Foster has not had a day off since February 2018 a full eighteen months ago.

He has continually struggled with his health issues that arise at Foster's age (68), which

result from lack of exercise, the deep physical burden of driving (counting off line

driving time that results from getting back into prime pick up areas) a full sixty hours a

week, (which is the federal maximum for truck drivers), as well as being the single father

of a fifteen year old child who home schools his child who is a true genius and is

currently taking classes online from Arizona State University, which tuition is paid for by

Uber, which makes this payment because Foster is easily in the highest category

(Diamond) of Uber Drivers, and Foster has driven well over the required 3000 trips.

Moreover, there are currently four other active law suits that Foster has filed that pertain

to this illegal foreclosure with a fifth on the way, (although by that time one of the four

active lawsuits will most likely be resolved.). (Exhibit 3). Indeed. In the past three

months Foster has filed two law suits in the Circuit Court of Cook County where he paid

both his filing fees, and he needed to pay for sheriffs' service for a total of $2000. Both of

these law suits were up against statute of limitation issues so the time and money for

these cases superseded this matter. Both of these law suits resulted directly from the core issue of the illegal foreclosure. Therefore, Foster is well under the 300 day "good cause" exception to the 180-day statute of limitations for ADA because in this instance the last day for Foster to file this ADA writ of mandamus would be September 24, 2019. And if poverty relative to one's expenses, health issues, time issues, and single parent responsibilities do not meet the good cause exception to filing an ADA claim when there is not one day of prejudice with respect to evidence within 6 months perhaps this court can explain why not.

7) This court is further advised that the Appellate Court disgracefully did not even address in any way, shape, or form the issue of Foster's ADA claim. Rather its response bordered on scatological. Moreover, Foster would be delighted to present to this court, the actual brief that he would have presented to the Appellate Court, which brief was finished a mere nine days after the Appellate Court's order.


Wherefore Petitioner Scott R Foster respectfully requests that this Honorable Court compel the Illinois Appellate Court First District Illinois Appellate Court First District Second Division Justices Mary Anne Mason. Aurelia Pucinski, and Michael B Hyman to accept Foster's Brief and from there ultimately hear and rule on the appeal.

Respectfully Submitted

_____                    8/7/2019
                                           _____
Scott R Foster                             Date


Scott R Foster

5990 North Ridge

Chicago, Illinois 60660

312 485 9800  ScottFosterGVC@gmail.com

# Exhibit 1

IN THE SUPREME COURT OF ILLNIOS

| | | |
|---|---|---|
| PHH Mortgage | ) | Appellate Court First Judicial District |
| Plaintiff Appellee | ) | Case Number 1-17-2170 |
| | ) | |
| v. | ) | Circuit Court Cook County—Chancery |
| | ) | Division |
| Scott R Foster | ) | Case Number 10 CH 48036 |
| Defendant Appellant | ) | The Honorable Daniel Patrick Brennan |
| | ) | Trial Judge Presiding |

**Petition for Leave to Appeal**

**Pursuant to Supreme Court Rule 315**

Scott R Foster

2488 Smith Street

Rolling Meadows, Illinois 60008

312 485 9800

E-FILED
9/21/2018 12:15 PM
Carolyn Taft Grosboll
SUPREME COURT CLERK

### Prayer for Leave to Appeal

Comes now petitioner Scott Foster pursuant to Supreme Court Rule 315, and respectfully petitions this Court for leave to appeal from the decision of the Appellate Court First District.

### Judgment Below

The original date upon which the judgment/order was entered was June 25, 2018, and the date on which the Motion to Vacate the above order was denied and that order was entered on July 27, 2018

## Point and Authorities Relied Upon For Review of Judgment of the Appellate Court

This Petition for Leave to Appeal (PLA) if accepted, will unquestionably be the greatest PLA ever successfully filed by a pro se litigant in the history of the Illinois Supreme Court, not because this is a case of possible "first impression" as it pertains to putting together a proper and **clearly defined** standard for a sufficient medical issue that would allow for an extension of time for a litigant to file a legal document/brief in an Illinois court case where there is an already an order with a filing deadline. (Indeed, it may not be a case of first impression at all but instead a blatant disregard of Illinois Court rules because there is a sign on the desk of the Illinois Supreme Court Clerk's Office in Chicago that states in relevant part: "It is the Policy of the Supreme Court of Illinois that: Individuals with disabilities have an equal opportunity to participate in and benefit from all Court activities." (Exhibit 1) Regardless, if this PLA is not accepted, [or the suggested alternative in a footnote at the end of this PLA is also ignored] the Petitioner has the right to take this matter to the Federal District Court in Chicago, because this matter involves ADA, which is a Federal Law. Rather, as part of the only issue raised for review Petitioner Scott R Foster ("Foster") will highlight the badly needed addition to Illinois Supreme Court Rule 113 that pertains to foreclosure law suits filed in Illinois. This addition could result in an additional .7 to 1.2 billion dollars in property taxes being paid each year throughout the State of Illinois and will finally prevent the worst kind of mortgage frauds/schemes from ever again occurring in the State of Illinois. Currently, Supreme Court Rule 113 is "made of Swiss Cheese" despite the fact that it succeeds in preventing some types of foreclosure abuse by both Plaintiffs and Defendants. And because Foster highlighted the deep costs/losses sustained by Cook County taxpayers in

¥ 2

the mere two documents of his that are presented for review there is another compelling issue raised herein—unquestioned overt racism practiced by both national lenders and Cook County Chancery Court Judges. This practice truly requires Federal scrutiny and perhaps oversight. Simply put. Cook County Chancery Court Judges in the Foreclosure Section between the years of 2009 and 2017 were only marginally better in their treatment of African Americans than were Southern state courts from before 1966. Thus, the Illinois Supreme Court can set aside whatever haughtier it has about the Petitioner being a non-attorney pro se as Foster knows far more about the combined issues of macro economics, econometrics, probability, real estate market analysis, short sales/foreclosures and mortgage schemes than the Illinois Supreme Court Justices or for that matter the committee of "experts" who put together Rule 113.

## Authorities

|  | Pages |
|---|---|
| **Illinois Supreme Court Rule 113** | 3,8,9,18 |
| **American Disabilities Act 42 U.S. Code § 12101 (ADA)** | 3,4,5 |
| **14th Amendment United States Constitution** | 3,4,5 |
| **Cathay Bank v. Accetturo 2016 Il App (1st) 152783 September 30, 2016** | 5,6 |
| **Reed v Illinois No. 14-1745 (7th Cir. 2015)** | 7 |
| Exhibit 1 (Photo and affidavit) | 1 |
| Exhibit 2 (Copy of Fannie Mae Rule) | 10, 11 |
| Exhibit 3 (Affidavit) | 14,15,16,17 |
| Exhibit 4 (Affidavit) | 17 |
| Exhibit 5 (Affidavit) | 18 |

ዾ 3

Exhibit 6 (Photo and Affidavit)                                    18

## Statement of Facts

This PLA pertains only to two motions by Foster and two subsequent orders entered by

the Appellate Court First District. The first Motion by Foster was filed on June 18, 2018

and was captioned as:

## Motion For Additional Extension of Time to File Initial Appellate Brief for Health Reasons

This motion is hereafter referred to as "**Motion 1**"  (A-31—A-42)

**Motion 1** stated that prior to filing **Motion 1** Foster had previously filed a motion before

the Illinois Appellate Court, 1st District asking for one final extension to file his Appellate

Court brief, which Motion was granted on June 7 2018 and which order gave Foster until

June 20, 2018 to file his brief.  But before the due date of June 20, 2018 Foster filed

**Motion 1** that sought an additional 30 days in which to file Foster's initial appellate court

brief, which motion for the **first time** raised Foster's diabetic/prediabetic

disability/medical condition (A-32—A33)  and also requested the additional time so that

he could advance an argument for adding provisions to Supreme Court Rule 113, wherein

Foster wrote his hope that the "brief goes further in protecting the rights of Cook

County's homeowners as well as the common welfare of every citizen in Cook County".

(A-32—A-33, A-37)

This motion was denied on June 25, and the case was dismissed ("**Order 1**") where there

was not one single word in Order 1 that pertained to Foster's medical issue. (A-4—A-5)

In response to **Order 1** Foster filed a second Motion that was captioned as:

**Motion to Vacate Final Order Dismissing Appellant's Appeal, which is filed pursuant to Illinois Supreme Court Rule 361, and which Motion specifically pertains to this Appellate Court's blatant disregard and willful violation of the**

A 4

**American Disabilities Act 42 U.S. Code § 12101 (ADA) which has well-known specific protections that pertain to this matter and which protections directly involve the <u>Equal Protection Clause of the Fourteenth Amendment of the United States Constitution</u>.** (A-11)

This Motion, **("Motion 2")** pertained to the American Disabilities Act 42 U.S.

Code § 12101 (ADA) ,which protections directly invoke the Equal Protection

Clause of the Fourteenth Amendment of the United States Constitution. **Motion 2**

stated that Foster has a recognized medical diagnosis known as pre diabetes that

has its own medical code, and which condition takes a substantial period of time

in one's day to work upon and which work to resolve can take up to a year. As

such, Foster wrote that Appellate Court's refusal to grant additional time in which

to allow Foster to file his brief when Foster's **Motion 1** raised for the **first time**

this disability/condition was a willful violation of ADA.

Foster's argument was as follows:

"The United States Constitution is the Supreme Law of the United States of

America, …and the first section of the14[th] Amendment of the United States

Constitution is the "Equal Protection Clause", which reads in its entirety as

follows:

All persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The American Disabilities Act (ADA) 42 U.S. Code § 12101 was signed into

law on July 26. 1990. Relevant portions of this law are the following: 42 U.S.

Code § 12101 - Findings and purpose… (b)PURPOSE It is the purpose of this



chapter—…(1)to provide a clear and comprehensive national mandate for the

elimination of discrimination against individuals with disabilities…(4) to

invoke the sweep of congressional authority, including the power to enforce

the Fourteenth Amendment and to regulate commerce, in order to address the

major areas of discrimination faced day-to-day by people with disabilities.

Furthermore 42 U.S. Code § 12102 – reads Definition of disability…

(1)DISABILITY The term "disability" means, with respect to an individual—

a physical or mental impairment that substantially limits one or more major

life activities of such individual record of such an impairment…(2) MAJOR

LIFE ACTIVITIES include: reading, concentrating, thinking, communicating,

and working." (A-11—A-15)

In **Motion 2** Foster also provided a letter from Lawrence J Beuret MD that stated

that Foster has a medical condition known as prediabetes. In particular Dr.

Beuret's letter stated that Foster's condition had an effect upon Foster's **"fatigue,**

**which limits the amount of work he can do in any day."** Dr. Beuret specifically

wrote:

"Scott now manifests the following physical symptoms clearly linked to prediabtes:
A) Frequent urination when he eats sugared foods and does not walk his required
five miles day; B) Cracked heels and all toes that have developed discoloration; C) a
waist size that is 44 inches; D) A weight of 257 pounds with a 5 foot 11 inch height. E)
Significant Peripheral Neuropathy in his left "pinky" finger; F) Itching, redness, and
irritation in the abdominal area adjacent to his belt; G) a constant redness in his left arm
pit; and H) most significantly fatigue, which limits the amount of work he can do in any
day." (A-28)

Therefore, Foster once again contended that the prior appellate court's order of June 7

while written (and stamped) as a final order meant nothing in the light of Foster's

disability/condition simply because Foster only raised for the **first time**, his

5 6

disability/condition in his motion of June 18, 2018. (A=15—A-16). An Order denying **Motion 2** was entered on July 27, 2018. This order is hereafter referred to as (**"Order 2"**). (A-8—A-9)

Furthermore in **Motion 1**, Foster raised issues that pertained to the conduct of both Tom Belczak, the attorney for PHH and the trial court Judge, Daniel Patrick Brennan: Specifically, Foster contended that in 2017 Judge Brennan disregarded Cathay **Bank v. Accetturo 2016 Il App (1st) 152783 September 30, 2016**, where Judge Brennan's ruling was inapposite to the **identical primary and dispositive fact in Cathay** where there was also no Notice of Acceleration and which opinion was not only authored by now Supreme Court Justice Scott Nevin but pertained to a ruling Judge Brennan made in another foreclosure case in 2015. (A-33—A-34)

Foster also addressed the issue of an increase in crime, which crime Foster wrote was documented in the greater number of murders over the past few years in those very neighborhoods that saw the greatest numbers of foreclosures. (A-35—A-36) He also addressed the issue of legal misconduct by Attorney Tom Belczak wherein Foster opined that criminal charges could be filed as the result of an upcoming Federal FDCPA (Fair Debt Collection Practice Ave) claim. (A-36—A-38)

Foster referred to the Case Shiller Index, a composite of monthly housing price changes in 20 metropolitan areas throughout the United States. (A-35—A-40). And in the second motion he referred to his attorneys, Joanne and Bob Sweeny a wife and husband legal team where Joanne was on the team at Jenner and Block that won the largest jury verdict

8 9

on behalf on an individual in the history of the United States and Bob won the largest

defamation of character verdict in the history of Illinois. Moreover, Foster wrote:

" the Sweenys felt it was a waste and money to pursue a defense when there came a time
when Judge Brennan flat out lied about there having been a required acceleration letter
filed, **which lie is contained in a transcript that will be presented to this court the
Appellate brief."** (A-20)

Foster also wrote that he had put in 650 hours of work in finishing his Appellate court

brief and that he had done an additional 300 hours of work completing a forensic

financial analysis of a "ledger", which detailed analysis had been presented to the

Attorney General of the United States of America/Department of Justice as part of

Foster's FCA (False Claim Act) claim. (A-19) And he also wrote that the Record on

Appeal was almost 2800 pages long. (A-18)

### Argument

Foster would initially note that while the only issues before this court are the two

orders, the two motions that Foster wrote had a substantial number of facts

pertaining to the underlying court case, and that as a result, Foster is able to put

together a relatively good scenario as to what occurred in the case.

The physical and mental symptoms Foster exhibited were sufficient that they

justified the diagnosis of prediabetes, where the medical approach to this

diagnosis required Foster to take additional time than otherwise would have taken.

This matter is directly on point with a 2015 Seventh Circuit Court of Appeals

decision in **Reed v Illinois No. 14-1745**. As did Reed, Foster has a medical issue

that mandates an accommodation that in this instance required additional time to

$\lambda$ $\emptyset$

complete his brief. And when combined with the argument already advanced before the Appellate Court, this is sufficient to overrule the Appellate Court

Indeed this court is asked to consider what would be an Appellate Court's proper ruling if an appellant or appellee **lawyer** was involved in a serious accident such that one's concentration was affected and the lawyer was fatigued such that the lawyer could not complete a brief that was also under a final order as to due date. Once again, the attorney's "**reading, concentrating, thinking, communicating, and working**" (all of which are affected by fatigue) would be impaired. Indeed, it is precisely these five words that Foster would urge the Illinois Supreme Court to adopt as the appropriate standard when Foster's PLA is accepted. (By which time Foster can afford a first rate attorney to write the actual briefs.)

Moreover the prior extensions in which to file the initial brief took into consideration other truly extenuating circumstances, which included an aggravated battery committed upon Foster by three drunk Uber passengers, (A-18) Foster's homelessness, which came (in part) as a direct result of criminal misconduct of PHH Mortgage and their attorneys. Specifically, Foster and his now 14 year old daughter slept at Northwestern University Library, (where Foster is an alum and was an Evans Scholar), the Edgewater Dunkin Donuts, two different motels, (at one of which Lucy received severe bed bug bites) the Red Line, the Brown Line, and the Purple Line, as well in the back of a rental car that Foster used to drive for Uber for 8 months where his passenger rating 4.95 put him in the top one percent of Chicago area drivers, and according to Uber, his percentage of passenger compliments relative to his "Five Star Ratings" was among the highest in the nation. (A-18—A-19)

9

Nevertheless, Foster readily acknowledges that the Appellate Court's prior order of June 18 would be dispositive if Foster had previously invoked his disability/medical condition in prior requests for time to complete the initial brief and told the Appellate Court that he could have the initial brief finished by a certain time. He did not.

The second issue raised by Foster in his initial motion for an extension request was that Foster wanted to propose an addition to Illinois Supreme Court Rule 113 that would result in the various taxing bodies in the State of Illinois garnering anywhere from .7 to 1.2 billion dollars in additional property tax revenue per year as a result of preventing unfair foreclosures as well as accelerating the foreclosure process when it is justified. Moreover, there would be far greater savings to the tax payers of the United States of America given that many mortgages are insured by FHA which is wholly owned by the United States government), as well as Fannie Mae and Freddie Mac both of which are GSEs (Government Sponsored Entities), wherein the United States of America ultimately guarantees the mortgage. Accordingly, Foster is proposing the following additional language to Illinois Supreme Court Rule 113:

**(c) Prove-up Affidavits ...**

(2) Content of Prove-up Affidavits. All affidavits submitted in support of entry of a judgment of foreclosure, default or otherwise, shall contain, at a minimum, the following information:

(iv). There must be submitted the following three documents at the time of the filing of the foreclosure action: Notice of Intent to Foreclosure (aka Notice of Default), Notice of Intent to Accelerate, and Notice of Acceleration. There must also be proof that said documents were sent by US Mail to the mortgagor. The only exception to this requirement is when the mortgage note does not contain language that requires such a process, but instead allows an immediate filing of a law suit for foreclosure.

(v) In addition to payment history, there must also be a complete record of all charges and credits on the record as well as a clear and concise explanation of all such

9
10

charges including a clear and precise explanation of all codes used. These charges are not
limited to payments but must also include the following; Late charges, late fees, pre
acceleration charges, charges after acceleration, adjustments to the ledger, fees related to
inspection of a property as well of credits of any kind. And in the event of a change in
lenders or a change in the holder of the note securing the mortgage, this complete record
of the previous lender(s)/note holder needs to be included with the foreclosure filing

Why are these changes so vitally important? Because the Illinois Supreme Court is

advised that there is often a second or third lender/note holder that often holds the

mortgage at the time a foreclosure law suit is filed, and this scenario will soon increase

given that there is an increasing absence of banks involved in writing a mortgage.

Mortgages are often packaged as a group in "baskets" that are sometimes known as

Mortgage Backed Securities, which baskets are sold (in expectation of a profit) to

investors. Thus, these MBSs can be repeatedly sold as commodities going from one so-

called "lender"/note holder (Mortgagee) to another. So the risk of a mistake at every

subsequent sale/transfer of a note puts the mortgagor deeply at risk of fraud, particularly

if the market "goes against" the return on any given basket, and the note holder seeks to

recoup a bad investment. But as harrowing as this is, even more importantly is the issue

of **Buyback Demand, which Foster has never seen appear in any Illinois Appellate**

**Court Opinion or any Illinois Supreme Court Opinion. And the best example of**

**Buyback Demand is the following rule pertaining to a Buyback Demand provision**

**which language is taken directly from Fannie Mae** (Exhibit 2)

Fannie Mae has the right to require a lender to repurchase a mortgage loan or an acquired
property, or remit a make whole payment, as a result of a breach of the Lender Contract.
For loans subject to the remedies framework, if a breach of a selling representation and
warranty is identified, such breach must result in a significant defect. In addition to
repurchase for breach of warranty, lenders may be required to repurchase some loans
because the terms under which the mortgage loans were purchased or securitized call for
a repurchase. Unless a loan has qualified for relief from enforcement for breaches of
certain selling representations and warranties in accordance with A2-3.2-02, Enforcement
Relief for Breaches of Certain Representations and Warranties Related to Underwriting

30 11

and Eligibility, a decision not to require repurchase at a particular time does not waive Fannie Mae's right to demand repurchase at a later time, or to institute other remedies for breach of the Lender Contract.

Fannie Mae may conduct several different types of reviews with respect to a mortgage loan, including a post-purchase review, an early payment default review, a servicing review, or a post-foreclosure review. During the course of a review, Fannie Mae may identify significant underwriting deficiencies, significant defects, a breach of a selling representation or warranty, or a breach of the terms of any applicable contract provision.

If any of the foregoing are identified, Fannie Mae may require the immediate repurchase of a mortgage loan or an acquired property or the remittance of a make whole payment (all of which fall under the definition of a "demand") unless and until such mortgage loan is eligible for relief from enforcement for breaches of certain underwriting and eligibility representations and warranties in accordance with A2-3.2-02, Enforcement Relief for Breaches of Certain Representations and Warranties Related to Underwriting and Eligibility.

Simply put, if the so called "lender"/loan originator/note holder screws up a GSE (Fannie or Freddie) loan or thinks that one may have screwed up a loan or feels that the mortgagor is even at risk of default, the lender/loan originator/note holder has an extreme incentive to **avoid** the buyback provision being enacted. And the best way for that to occur is to commit some small sort of "undetectable" fraud that places the blame/responsibility on the mortgagor. There are all kinds of schemes one can cook up if one is not required to detail the complete record. **One such example would be a forbearance that was given but only recorded through a change in charge codes that required interpretation as well as charges that demonstrated the exact date on which acceleration was actually done, which acceleration was consistent with taking advantage of a loop hole in Dodd Frank (Section 1401) that was passed into law on July 21, 2018 . If there was merely a record of payments made/not made as opposed to all records of the transaction, this scheme would be overlooked!** And if this was a Fannie Mae Loan where this occurred with hundreds of similar mortgagors, then the taxpayers of the United States of America would be cheated out of tens of millions of

<del>P</del> 12

dollars, and the only way a mortgagor would be able to figure this out would be if he really understood real estate and had a best friend in real estate such as Charlie Eck whose office is in Chicago and who is a former President of the National Association of Mortgage Brokers and who could explain to Foster the concept of Buyback Demand. Hmmmm. And if this "hypothetical" example were true, then someone such as Foster would have a valid FCA claim with DOJ.

As the caption page makes clear, this case was filed in 2010. The primary reason for this length is that PHH did not file its Third Motion for Sale until 6 years and 9 days after the law suit was filed and the prior two Motions for Sale were withdrawn with no explanation. (A-19 & A-21—A-22) Why? Because PHH figured out that Foster "knew his stuff", and that if PHH released these documents, it would become widespread knowledge, and a small company like PHH would go out of business.

The records released by PHH in its third Motion for Sale made clear that Foster did not owe one dime as he had been given six months forbearance beginning in March 2010, which forbearance was cut short because PHH wanted to take an advantage of a loophole that the passage of Dodd Frank presented when it was signed into law on July 21, 2010. And despite the fact that this was unquestionably new information, Judge Brennan refused to allow Foster to file either an affirmative defense or a counterclaim. (A-21—A-22)

In support of the Dodd Frank scheme, PHH and its attorneys Shapiro Kreisman endlessly verbigerated the same lie. That lie is that a Notice of Intent to Foreclose is the same document as both/either a Notice of Intent to Accelerate and/or a Notice of Acceleration. It is neither. These are three separate and distinct documents that must be presented at

13

different stages of the foreclosure process in order for a judicial sale to occur. (A-21 & A-33—A-34) And that lie will put Tom Belczak and a few PHH employees in Federal Prison

Foster pointed out in **Motion 1** that the loss to Cook County tax collections as the direct result of having Judge Brennan on the bench during the entire foreclosure debacle was such that just by himself, Judge Brennan had cost Cook County property tax collections one quarter of a billion dollars over the prior five years, and that the loss in Cook County home values attributable to Judge Brennan (relative to any other of the 19 metropolitan areas in the Case Shiller Housing Price Index) was 2.5 Billion Dollars. Moreover Foster opined that there was a real cost in blood/human lives that resulted from Judge Brennan's applying a rubber stamp. Specifically, in poor and working class neighborhoods, the people who "hold things together" are the biggest stake holders--the owners of residential properties. And when a neighborhood loses those stakeholders due to excessive foreclosures or unfair property taxes (as was documented in a recent investigative series titled "The Tax Divide" by the Chicago Tribune) then there will be an increase in all kinds of negative social consequences. (A-35—A-36)

Foster also pointed out that with respect to the 5 million or so residents of Cook County, what mattered most was the horrific beating of housing prices in Cook County. To substantiate his claims, Foster further pointed to the aforementioned Case Shiller Index, Since mid-2008 (just as the Great Recession was beginning and housing prices had not yet cratered), the composite 20 city Case Shiller Index has overcome its slump in the ten years after 2008 and recovered from an index reading of 172 to 208, an increase of 20 percent. Of the 20 cites, 19 cities had higher individual increases in the Case Shiller

<span style="text-align: center; display: block;">℞ /4</span>

Index over this time period. The only city that did not recover from its 2008 index 10 years ago was Chicago, which current Case Shiller reading was 92 percent of what it had been ten years before. If the Chicago Case Shiller Index had merely reached parity over the past ten years, the following would have been true of the Chicago area: Instead of an average home value of value of $218,000, it would be around $238,000. That is an average difference in value of $20,000 per unit. Given that there are approximately 1.1 million homes in Cook County, this meant that the current net aggregate loss in home values in large part because of excessive foreclosures was a staggering $22,000,000,000 Moreover, if one assigned a mere 12 percent of Cook County foreclosures to the courtroom of Daniel Patrick Brennan, that means that over the course of this crisis, he alone had carved out 2.6 billion dollars in lower property value as a result of his rubber stamp approach. Foster further noted that the property tax payment for the average home in Cook County is $4300. If that tax were increased merely by overcoming the 8 percent negative value of Case Shiller such that Chicago was even with 2008, it would result in an additional tax of approximately $390 per residence, which in turn would have netted the various taxing bodies in one year alone $425,000,000, which if one assigned a mere 12 percent to Judge Brennan meant that the cost in terms of lost taxes with regards to his sitting on the bench and rubberstamping foreclosures was $51,000,000 a year for at least the past five years. (A-35—A—40)

But it gets even uglier as the following facts demonstrate that not only has Judge Brennan cost Cook County tens of millions in yearly property tax revenues, but he has "accomplished" this as a result of his being an outright racist (as were other Presiding Chancery Court Judges in Foreclosure during this time period, including the Honorable

Justice Mary Ann Mason who authored both orders that are being reviewed before this court.) This horror story is as follows:

In 2008 there were 8 foreclosures in the Chicago's African American neighborhoods. But there were 1014 short sales during the same year. Thus, African Americans had made it an art form to do short sales in an effort to avoid the disastrous consequences of a foreclosure, as did those who lived in Chicago White neighborhoods, because in 2008 in there were 6 foreclosures and 580 short sales in White neighborhoods. But in 2009, overt racism had reared its head both in the Cook County Court system and with the nation's mortgage lenders such as PHH Mortgage.

Between the years 2009 (which was the first year of the major drop in housing prices) and 2017 in Chicago White neighborhoods, short sales accounted for 37.1 percent of all distressed properties sold. During the same period short sales accounted for only 15.4 percent of all distressed properties sold in African American neighborhoods. Therefore, if one lived in a predominantly African American Chicago during the foreclosure disaster years of 2009 to 2017, one had a 58 percent less chance of selling one's distressed property as a short sale than if one lived in a White Chicago neighborhood.

Similarly, both White and African American Suburbs in Cook County in 2008 had approximately 99 percent of all distressed properties close as short sales. But between 2009 and 2017 31.1% of all distressed properties sold in White Suburbs were short sales, whereas 14.3% of all distressed properties sold in African American Suburbs were short sales. This means that if one lived in a predominantly African American suburb during the foreclosure disaster years of 2009 to 2017, one had a fifty four percent less chance of selling one's distressed property as a short sale than if one lived in a White suburb.

Because the data prior to 2007 is archived on the MLS, it is much harder to do macro comparisons as Foster has just done. So Foster is limited to a much smaller data base. But a fair issue that needs to be addressed is the question of whether the greater number of excessive foreclosures in African American neighborhoods was related to a disproportionate increase in prices in African American neighborhoods beginning in 2000 up to the market peak in 2006 such that the higher rate of foreclosures was the result of a greater percentage increase in prices in African American neighborhoods relative to White neighborhoods.

But examining a sample of official neighborhoods in Chicago casts doubt on this hypothesis. Specifically, Foster examined four of the 77 official Chicago neighborhoods, (which boundaries were first demised by University of Chicago sociologists in the late 1920s) where he looked at single family unattached residences (houses). And the results were exactly what was expected given the clear cut racism already demonstrated. The African American neighborhood Foster selected (Avalon Park), had the smallest percentage increase in sale price from the year 2000 to 2006, yet it had the worst percentage "comeback" from its price high in 2006 wherein it had still lost 29 percent of its peak 2006 average price by the end of 2017, and it had the greatest percentage of foreclosures relative to short sales from the years 2009 to 2017 compared to the other three neighborhoods where the White neighborhood (Lincoln Square) had the highest percentage of price increase from 2000 to 2006, yet it had the lowest percentage of foreclosures relative to short sales. And by the end of 2017, its average price relative to peak average price in 2006 had increased by eight percent. And the same result occurred when Foster looked at the same group of statistics for Edgewater condos in a

16/17

predominately white neighborhood, where the price of an average condo in Edgewater in 2000 was a mere $35,000 higher than the house price in Avalon Park in 2000. Edgewater condos went up 71 percent in price from 2000 to 2006 (as compared to Avalon Park's increase of 59 percent). Thus, by the end of 2017, Edgewater condo prices were down a mere eight percent from 2006. Not surprisingly, very much White Portage Park and mixed Hispanic/White Garfield Ridge were in between Avalon and Edgewater with Portage Park predictably suffering less damage. (Exhibit 3)

These numbers/statistics would make Lester Maddox, Ross Barnett, Orval Faubus, George Wallace, and Bull Connor gloat with pride. Moreover, Judge Daniel Patrick Brennan directly ignored instructions from an Illinois Appellate Justice who is now an Illinois Supreme Court Justice who is African American. There are only three groups to blame for these numbers. The history of short sales in 2008 make clear that African Americans were very motivated in getting short sales completed and therefore not to blame. This only other groups involved in the process, are the Chancery Judges of Cook County and the lenders/loan originators/note holders. The result of this complete failure of the Cook County court system and criminal conduct by lenders/loan originators/note holders is utterly predictable. Between the years 2013 and 2017, Illinois lost 89,000 residents, while all of its neighboring states gained population as follows: Wisconsin 60,000; Iowa 70,000; Indiana 100,000; Missouri72,000; and Kentucky 55,000. (Exhibit 4) And while the failure to fairly treat African Americans is not the only reason for this loss, the fact is a Jew at Triblenka had statistically a better chance of surviving than a foreclosure defendant had in getting a jury trial in Judge Brennan's courtroom. Indeed, it

PF 18

is very possible that Judge Brennan has cost United States taxpayers more money than any Judge in the history of the US.

With respect to criminal charges being filed against Tom Belczak, Tom is now truly out of luck because Foster as promised has recently filed a federal FDCPA Claim in Federal Court, and it is before "Hard as Nails" Federal Judge Virginia Kendall who will most likely put Tom in Federal Prison because Tom and various PHH employees have among other crimes provided signed affidavits that went to great lengths to establish that there was a Notice of Acceleration when there was none, and said affidavits were sent via US Mail. (Exhibit 5). And of course Foster strongly believes that if this PLA is denied, he will then successfully bring the pre diabetes disability issue to Federal Court, which will truly make Illinois look like the South of the 1960s where there was constant Federal judicial action that overcame state court malfeasance.

Finally, as the photo in Exhibit 6 makes clear, Foster has long since completed his Appellate Court brief (absent the addition of the Rule 113 change) a mere nine days after the due date.

Therefore, the Illinois Supreme Court will utterly fail to protect its citizens by turning a blind eye for fear of what it might see to the extent that it is very possible that from 2009 through 2016 there wasn't a single residential foreclosure case that went to a jury trial in the Chancery Court Division of Cook County. Indeed, this Court should require each and every judge who served in Cook County's Chancery Court-Foreclosure Division to provide records of the number of total cases that were filed from 2009 to 2016 and disposed of as well as the number of cases that went to trial as jury trials. To do otherwise will expose the Illinois Supreme Court to nationwide ridicule as this entire matter could

19

end up with Foster having three cases before Federal Court, all of which will succeed and

Foster at the same time having urged the Illinois Supreme Court to make changes in its

own rules that could bring in as much as 1.2 billion dollars in tax revenue and around 50

billion in additional residential property value to this great state.[1]

## Conclusion

Wherefore Petitioner Scott R Foster pursuant to Supreme Court Rule 315, respectfully

petitions this Court for leave to appeal from the decision of the Appellate Court First

District entered July 27, 2018.

Respectfully Submitted

Scott R Foster
2488 Smith Street
Rolling Meadows, Illinois 60008

---

[1] With respect to the urgent and proposed changes to Supreme Court Rule 113, Foster
suggests that a possible and perhaps best alternative solution for this PLA would be for
the Illinois Supreme Court to simply enact the changes he has proposed to Supreme Court
Rule 113 and on its own motion remand this matter back to the Appellate Court with
instructions that this matter be randomly assigned and Foster be given 28 days to file his
Appellate Court brief.

20

SUPREME COURT OF ILLNIOS

| | | |
|---|---|---|
| PHH Mortgage | ) | Appellate Court First Judicial District |
| Plaintiff Appellee | ) | Case Number 1-17-2170 |
| | ) | |
| v. | ) | Circuit Court Cook County—Chancery |
| | ) | Division |
| Scott R Foster | ) | Case Number 10 CH 48036 |
| Defendant Appellant | ) | The Honorable Daniel Patrick Brennan |
| | ) | Trial Judge Presiding |

Certificate of Compliance

I certify that the brief conforms to the requirements of Rules 341(a) and (b). The length of this brief, excluding the pages or words contained in Rule 341(d) cover, the Rule (h) (1) statement of points and authorities, the Rule 341 (c) certificate of compliance, and certificate of service, and those matters to be apprehended to the brief under Rule 342 (a) , is 20 pages of

IN THE

SUPREME COURT OF ILLNIOS

| | | |
|---|---|---|
| PHH Mortgage | ) | Appellate Court First Judicial District |
| Plaintiff Appellee | ) | Case Number 1-17-2170 |
| v. | ) | Circuit Court Cook County—Chancery |
| | ) | Division |
| Scott R Foster | ) | Case Number 10 CH 48036 |
| Defendant Appellant | ) | The Honorable Daniel Patrick Brennan |
| | ) | Trial Judge Presiding |

PROOF OR SERVICE/NOTICE OF FILING

TO:    Joseph Herbas Esq.

c/o Shapiro Kreisman

200 North LaSalle, 28th Floor

Chicago, Illinois 60601          71 JF

You are hereby notified that on September 22, 2018, I submitted for electronic filing
Petitioner's Petition for Leave to Appeal to the Office of the Clerk of the Supreme Court of
Illinois, and a copy to each of the above-named counsel by personal delivery.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil
Procedure, the undersigned certifies that the statements set forth in this instrument are true
and correct

9/21/2018

Date

Scott R Foster

2488 Smith Street

Rolling Meadows, Illinois 60008

312 485 9800

**Exhibit 1**

IN THE

SUPREME COURT OF ILLNIOS

| | | |
|---|---|---|
| PHH Mortgage | ) | Appellate Court First Judicial District |
| Plaintiff Appellee | ) | Case Number 1-17-2170 |
| | ) | |
| v. | ) | Circuit Court Cook County—Chancery |
| | ) | Division |
| Scott R Foster | ) | Case Number 10 CH 48036 |
| Defendant Appellant | ) | The Honorable Daniel Patrick Brennan |
| | ) | Trial Judge Presiding |

AFFIDAVIT IN SUPPORT OF EXHIBIT 1 IN PETIONER'S PLA

I Scott R Foster certify that affiant has read the foregoing affidavit and reviewed the photo

included in Exhibit 1; that the affiant knows the contents herein; and that if called, affiant

could testify that the facts set forth in the Exhibit 1are true and correct.

I Scott R Foster further certify : That the photo included in Exhibit 1 is a photo that is

taken from the desk of the Illinois Supreme Court Clerk's Office in Chicago, Illinois.

Scott R Foster

STATE OF ILLINOIS        )

1

COUNTY OF COOK                )

Subscribed and Sworn/Attested Before Me

this date: Sept 21, 2018

_Maria Hurtado_

By Scott R Foster                    (Notary's Official Seal)

OFFICIAL SEAL
MARIA HURTADO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/13/20

2



EXHIBIT
1 PHOTO

SUBMITTED - 2289486 - Scott Foster - 9/21/2018 12:15 PM

**Exhibit 2**

SUBMITTED - 2289486 - Scott Foster - 9/21/2018 12:15 PM

# Selling Guide

**Published September 4, 2018**

Guide Table of Contents

A2-3.2-02: Enforcement Relief for Breaches of Certain Representations and Warranties Related to Underwriting and Eligibility (08/07/2018)

This topic describes the framework that provides lenders with relief from Fannie Mae's enforcement for breaches of certain underwriting and eligibility representations and warranties for certain mortgage loans acquired on or after January 1, 2013, that meet specific payment history and other eligibility requirements. This topic contains information on the following subjects:

- Overview of the Enforcement Relief Framework ➤
- Scope of Enforcement Relief of Underwriting and Eligibility Representations and Warranties ➤
- Mortgage Loans Eligible for Enforcement Relief ➤
- Additional Eligibility Criteria for Versions 1 and 2 ➤
- Notification of Relief ➤
- Life-of-Loan Representation and Warranty Exclusions ➤
- Comparison of Version 1 and Version 2 of the Framework ➤

BACK TO PART A➤

## Overview of the Enforcement Relief Framework

Representations and warranties required by Fannie Mae are described in the *Mortgage Selling and Servicing Contract*, the *Selling* and *Servicing Guides*, and other Lender Contracts. Violation of any representation and warranty is a breach of the Lender Contract, entitling Fannie Mae to pursue certain remedies, including a loan repurchase or make whole payment demand as more fully described in A2-3.2-01, Loan Repurchases and Make Whole Payments Requested by Fannie Mae. However, for conventional loans that are acquired by Fannie Mae on a flow basis on or after January 1, 2013, the lender will be relieved of its obligation to remedy breaches of certain underwriting and eligibility representations and warranties if the loan meets certain eligibility criteria described under Mortgage Loans Eligible for Enforcement Relief below. This framework does not change the underlying representations and warranties the lender makes to Fannie Mae when selling loans; it changes whether and how Fannie Mae will enforce breaches of those representations and warranties after a loan has achieved relief under the framework. No relief will be available for breaches of certain "life-of-loan" representations and warranties as described in Life-of-Loan Representation and Warranty Exclusions below, regardless of whether a loan otherwise qualifies for relief. The availability of the enforcement relief framework does not discharge lenders from the responsibility for underwriting and delivering quality loans in accordance with Fannie Mae's requirements.

**Note:** Certain components of the loan may qualify for individual enforcement relief outside of this framework. For example, a loan may qualify for enforcement relief on the borrower's income at the time the loan is sold to Fannie Mae, and later obtain enforcement relief based on payment history. Life-of-loan exclusions will apply at all times. See A2-2.1-04, Limited Waiver and Enforcement Relief of Representations and Warranties for Mortgages Submitted to DU, for additional information.

## Scope of Enforcement Relief of Underwriting and Eligibility Representations and Warranties

With respect to an eligible mortgage loan (as defined below), a lender will be relieved of the requirement to remedy a mortgage loan (such as repurchase, a make whole payment, or other repurchase alternative as more fully described in A2-3.2-03, Remedies Framework) if that mortgage

loan violates Fannie Mae's single-family underwriting and eligibility requirements described in the applicable parts of the *Selling Guide* and other Lender Contracts relating to:

- underwriting the borrower, which includes the lender's assessment of the borrower's loan terms, credit history, employment and income, assets, and other financial information used for qualifying the borrower for the loan;
- underwriting the subject property, which includes the lender's analysis of the description and valuation of the property to determine its adequacy as collateral for the mortgage transaction; and
- underwriting the project in which the property is located, which includes the lender's analysis of the condo, co-op, or PUD project in accordance with Fannie Mae's requirements.

The following subparts of the *Selling Guide* are covered by the relief:

- Subpart B1, Loan Application Package;
- Subpart B2, Eligibility;
- Subpart B3, Underwriting Borrowers;
- Subpart B4, Underwriting Property; and
- Subpart B5, Unique Eligibility and Underwriting Considerations.

**Note**: If a mortgage loan with a breach or alleged breach has achieved enforcement relief as provided in this topic, then the obligation to indemnify Fannie Mae is limited in certain respects. See A2-1-03, Indemnification for Losses, for a description of the continuing indemnification obligations.

## Mortgage Loans Eligible for Enforcement Relief

To be eligible for the representation and warranty enforcement relief, a mortgage loan must meet the requirements described below. There are two versions of the framework, based on the acquisition date of the mortgage loan. Each version then has specific additional requirements, including:

| Version 1 | Version 2 |
|---|---|
| Version 1 based on acquisition date | Version 2 based on acquisition date |
| Version 1 payment history requirements | Version 2 payment history requirements or Version 2 QC review requirements |
| Additional eligibility criteria | Additional eligibility criteria |

## Version 1 and Version 2 Acquisition Date Requirements

| Version of the Framework | Acquisition Date |
|---|---|
| Version 1 | Mortgage loans that were acquired by Fannie Mae as follows: whole loans purchased on or after January 1, 2013, but before July 1, 2014; or mortgage loans delivered into MBS with pool issue dates on or after January 1, 2013, but before July 1, 2014. |
| Version 2 | Mortgage loans that were acquired by Fannie Mae as follows: whole loans purchased on or after July 1, 2014; or mortgage loans delivered into MBS with pool issue dates on or after July 1, 2014. |

## Version 1 Payment History Requirements

To be eligible for enforcement relief under Version 1 of the framework, the mortgage loan must meet one of the following payment history requirements:

- The borrower was not 30 days delinquent during the 36 months following the acquisition date, or for Fannie Mae Refi Plus, DU Refi Plus, or high LTV refinance loans, the borrower was not 30 days delinquent during the 12 months following the acquisition date; or
- The borrower
  o had no more than two 30–day delinquencies and no 60–day or greater delinquencies, during the 36 months following the acquisition date; and
  o was current as of the 60th month following the acquisition date.

SUBMITTED - 2289486 - Scott Foster - 9/21/2018 12:15 PM

**Version 2 Payment History Requirements**

To be eligible for relief under Version 2 of the framework, for mortgage loans other than Fannie Mae Refi Plus, DU Refi Plus, and high LTV refinance loans, if the relief is based on the borrower's acceptable payment history, the relief will occur

- upon payment by the borrower of the first 36 monthly payments due following the mortgage loan acquisition date, provided that the borrower
  - had no more than two 30-day delinquencies,
  - had no 60-day or greater delinquencies, and
  - is not 30 or more days delinquent with respect to the 36th monthly payment.

For Fannie Mae Refi Plus, DU Refi Plus, and high LTV refinance loans, relief is based on the earlier of:

- payment by the borrower of the first 12 monthly payments due following the mortgage loan acquisition date, provided the borrower had no 30–day or greater delinquencies; or
- payment by the borrower of the first 36 monthly payments due following the mortgage loan acquisition date, provided the borrower
  - had no more than two 30-day delinquencies,
  - had no 60-day or greater delinquencies, and
  - is not 30 or more days delinquent with respect to the 36th monthly payment.

**Version 2 Fannie Mae Quality Control Review**

Under Version 2 of the framework, there is an alternative path through which mortgages may qualify for relief of the selling representations and warranties based on the satisfactory conclusion of a quality control review. This enforcement relief will occur when one of the following takes place:

- Fannie Mae completes a full-file quality control review of the loan file, which includes a review of the credit underwriting and eligibility of the borrower, the property (including its value), and the project in which the property is located, if applicable, and determines that the mortgage is acceptable (that is, it is not subject to a repurchase demand).
- Fannie Mae completes the full-file quality control loan file review and determines the mortgage is not acceptable because of a selling deficiency that the *Selling* or *Servicing Guide* specifically identifies may be corrected. If the lender corrects such deficiency in the time frame and manner specified in the Lender Contract, relief will be effective upon the satisfactory correction of the deficiency as determined by Fannie Mae through a reassessment of the mortgage loan.
  - For example, if the mortgage file delivered to Fannie Mae did not contain the required verification of income, the mortgage defect would be deemed to be corrected if the lender provided the missing documentation requested by Fannie Mae within the time frame specified. Another example of an action taken to correct a deficiency is rectifying a prior mortgage lien by producing evidence of a recorded satisfaction or release of such prior mortgage lien within the time frame specified.
- Fannie Mae completes the full-file quality control loan file review and determines the mortgage is not acceptable but may be eligible for a repurchase alternative which expires or terminates by its terms. In this case, relief will be effective upon the satisfactory expiration or termination of the alternative to repurchase.
  - For example, if Fannie Mae determined a mortgage was not acceptable and, as an alternative to repurchase, Fannie Mae and the lender agreed that the mortgage would be subject to credit enhancement for 5 years, the mortgage would be relieved of the selling representations and warranties at the end of the 5-year period. Other possible alternatives to repurchase include recourse, make-whole arrangements, and certain split loss agreements; in each case, the repurchase alternative must satisfactorily expire or terminate by its terms in order for the affected mortgage to be eligible for relief from the selling representations and warranties under Version 2 of the framework.

**Note:** The requirements for obtaining relief based on a full-file QC review apply both to performing loans and non-performing loans. As a result, lenders may obtain relief through the quality control path regardless of whether the mortgage loan had an acceptable payment history.

**Post-Relief Loan File and Appraisal Reviews.** Fannie Mae may perform loan file reviews for quality assurance and audit purposes both before and after a loan obtains enforcement relief under the framework. However, Fannie Mae cannot issue a repurchase demand or seek an alternative remedy with respect to a deficiency in the underwriting of the borrower, the property, or the project that is relieved under the framework (such as a deficiency related to the LTV ratio or debt-to-income ratio) when that deficiency is discovered after the loan has obtained enforcement relief unless the deficiency qualifies as breach of a "life-of-loan" representation and warranty. A repurchase demand or alternative remedy may be issued only when the deficiency involves one of the life-of-loan exclusions or another provision of the *Selling Guide* that is not relieved under the framework.

**Note:** If, after a loan has obtained relief under the framework, Fannie Mae reviews an appraisal and determines that the property value used to calculate the LTV ratio was incorrect at the time of delivery, Fannie Mae will not issue a repurchase demand based solely on the fact that the newly calculated LTV ratio is over 80% and the loan did not have credit enhancement in place when it was delivered to Fannie Mae.

## Additional Eligibility Criteria for Versions 1 and 2

In addition to the acquisition date, payment history, and QC requirements described above, the following criteria must also be met for mortgage loans to qualify for relief:

- The mortgage loan must be a conventional mortgage loan sold to Fannie Mae on a flow basis.
- Government-guaranteed or -insured loans are not eligible for enforcement relief.
- Non-flow seasoned or bulk mortgages may be eligible for enforcement relief only on a negotiated basis. (Seasoned loans that are sold to Fannie Mae on a flow basis in accordance with the *Selling Guide* are eligible for enforcement relief.)
- The determination of whether the loan has an acceptable payment history begins on the date of the first monthly mortgage payment due after the Fannie Mae acquisition date.
- With the exception of mortgage loans with temporary buydowns, neither the lender nor a third party with a financial interest in the performance of the loan (such as a mortgage broker, correspondent lender, or mortgage insurer) can escrow or advance funds on behalf of the borrower to be used for payment of any principal or interest payable under the terms of the mortgage loan for the purpose of satisfying the payment history requirement.
- The mortgage loan cannot have been sold to Fannie Mae with any credit enhancement other than traditional primary mortgage insurance (i.e., lender- or borrower-paid mortgage insurance).
- Mortgage loans with credit enhancement other than traditional primary mortgage insurance may be eligible for enforcement relief only on a negotiated basis.
- Loans not impacted by a disaster that become subject to a forbearance agreement, repayment plan, or otherwise modified from the original terms after acquisition by Fannie Mae are not eligible for relief based on the borrower's payment history, but may be eligible on the basis of a quality control review of the loan file if the loan otherwise meets the Version 2 requirements.
- Loans that become subject to a disaster-related forbearance agreement and any subsequent repayment plan or modification, are eligible for relief based on the borrower's payment history or on the basis of a quality control review of the loan file if the loan otherwise meets the Version 2 requirements. See the disaster-related forbearance criteria below for additional information.
- With the exception of certain loans purchased under the terms of a long-term standby purchase commitment (LTSC), the loans cannot have had any delinquencies between the origination date and the Fannie Mae acquisition date.
  - For loans classified as "Class 1 Mortgage Loans" or "Class 4 Mortgage Loans" that are purchased under an LTSC, the payment history requirement will be measured from the date the loan was committed under the LTSC structure (the 12–, 36–, or 60–month time frame will begin on the date the loan was committed into the LTSC).

- The mortgage loan must not be subject to an outstanding request for repurchase, repurchase alternative, or make whole payment. (See A2-3.2-03, Remedies Framework, for additional information.)
  **Note**: Unless otherwise agreed to by Fannie Mae and the lender, once a mortgage loan has qualified for the representation and warranty enforcement relief by compliance with the requirements above, eligibility for the enforcement relief is final and irrevocable subject to the life-of-loan representation and warranty exclusions.
  **Additional Eligibility Criteria for Loans Subject to Disaster-Related Forbearance**

To be eligible for relief, the following applies:

- The loan is impacted by a disaster occurring on or after August 25, 2017.
- The property or borrower's place of employment is located in any county, city, or parish that is designated by the Federal Emergency Management Agency as eligible for Individual Assistance as a result of a natural disaster.
- the loan will be eligible for relief based on payment history on the later of
  - the applicable payment history period end date as required under Version 1 or 2 of the framework; or
  - the date the loan transitions out of disaster-related forbearance and is brought current via a reinstatement, repayment plan, or permanent modification.
- the loan must be brought current through a lump sum payment or a repayment plan completed as agreed. If the forbearance plan transitioned to a permanent modification, the borrower must have completed the trial period plan and executed a permanent modification agreement for any of the modification options available through the Fannie Mae *Servicing Guide*.

The period of time the loan is in forbearance "counts" toward the payment history requirement and the months in forbearance are not considered delinquent within the relief framework. For example, if the forbearance occurred during months 30-32, the loan may still be eligible for enforcement relief on or after the 36 th month of payment history as long as all other payments outside the forbearance met the requirements.

## Notification of Relief

Fannie Mae will provide lenders with reports listing those mortgage loans that met the eligibility requirements for relief.

## Life-of-Loan Representation and Warranty Exclusions

A lender is not relieved from the enforcement of breaches of its representations and warranties on any mortgage loan, including eligible mortgage loans, with respect to the following matters even if those matters are addressed in Subparts B1 through B5 of the *Selling Guide*. With respect to each mortgage loan, a lender remains responsible for the life-of-loan representations and warranties related to the following, as more fully described in A2-2.1-07, Life-of-Loan Representations and Warranties:

- Fannie Mae Charter Act Matters;
- Misstatements, Misrepresentations, and Omissions;
- Data Inaccuracies;
- Clear Title/First-Lien Enforceability;
- Compliance with Laws and Responsible Lending Practices; and
- Acceptable Mortgage Products.

## Comparison of Version 1 and Version 2 of the Framework

The following chart compares Version 1 and Version 2 of the framework for mortgages other than Refi Plus, DU Refi Plus, and high LTV refinance loans.

**Representations and Warranties Framework—**
**Mortgage Loans other than Refi Plus, DU Refi Plus, and High LTV Refinance Loans**

| Relief Criteria | Version 1 | Version 2 |
|---|---|---|
| Effective Dates | Effective for loans acquired on or after January 1, 2013, but before July 1, 2014 | Effective for loans acquired on or after July 1, 2014 |
| Number of required consecutive monthly payments | 36 | 36 |
| Number of delinquencies permitted during first 36 monthly payments after Fannie Mae acquisition in order to be eligible for relief after the 36th monthly payment | 0 x 30 | 2 x 30 and 36th monthly payment is not delinquent |
| Opportunity to re-establish acceptable payment history if there were delinquencies in the first 36 monthly payments after Fannie Mae acquisition? | Yes, as of the 60th monthly payment, provided no more than 2 x 30 delinquencies in first 36 monthly payments and 60th monthly payment is not delinquent | Not applicable |
| Eligible for relief after satisfactory conclusion of quality control review? | No | Yes |
| Additional Eligibility Criteria (described above) | No differences between Versions 1 and 2 other than loans may be eligible for QC relief under Version 2 | |
| Notification of Relief | No differences between Versions 1 and 2 | |
| Life-of-Loan Exclusions | No differences between Versions 1 and 2 | |

The following chart compares Version 1 and Version 2 of the framework for Refi Plus, DU Refi Plus, and high LTV refinance loans.

**Representations and Warranties Framework—**
**Refi Plus, DU Refi Plus, and High LTV Refinance Loans**

| Relief Criteria | Version 1 | Version 2 |
|---|---|---|
| Effective Dates | Effective for loans acquired on or after January 1, 2013, but before July 1, 2014 | Effective for loans acquired on or after July 1, 2014 |
| Number of required consecutive monthly payments | 12 | 12 |
| Number of delinquencies permitted during first 12 monthly payments after Fannie Mae acquisition in order to be eligible for relief after the 12th monthly payment | 0 x 30 | 0 x 30 |
| Opportunity to re-establish acceptable payment history if there were delinquencies in the first 12 monthly payments after Fannie Mae acquisition? | Yes, as of the 60th monthly payment, provided no more than 2 x 30 delinquencies in first 36 monthly payments and 60th monthly payment is not delinquent | Yes, as of the 36th monthly payment, provided no more than 2 x 30 delinquencies in first 36 monthly payments and 36th monthly payment is not delinquent |
| Eligible for relief after satisfactory conclusion of quality control review? | No | Yes |
| Additional Eligibility Criteria (described above) | No differences between Versions 1 and 2 other than loans may be eligible for QC relief under Version 2 | |
| Notification of Relief | No differences between Versions 1 and 2 | |
| Life-of-Loan Exclusions | No differences between Versions 1 and 2 | |

## Related Announcements

The table below provides references to the Announcements that have been issued that are related to this topic.

| Announcements | Issue Date |
|---|---|
| Announcement SEL-2018-06 | August 07, 2018 |
| Announcement SEL-2017-10 | December 19, 2017 |
| Announcement SEL-2016-09 | December 6, 2016 |
| Announcement SEL-2016-07 | August 30, 2016 |
| Announcement SEL-2016-02 | February 23, 2016 |
| Announcement SEL-2015-12 | November 3, 2015 |
| Announcement SEL-2014-16 | December 16, 2014 |
| Announcement SEL-2014-07 | June 24, 2014 |
| Announcement SEL-2013-03 | April 9, 2013 |

**Exhibit 3**

IN THE

SUPREME COURT OF ILLNIOS

| | | |
|---|---|---|
| PHH Mortgage | ) | Appellate Court First Judicial District |
| Plaintiff Appellee | ) | Case Number 1-17-2170 |
| | ) | |
| v. | ) | Circuit Court Cook County—Chancery |
| | ) | Division |
| Scott R Foster | ) | Case Number 10 CH 48036 |
| Defendant Appellant | ) | The Honorable Daniel Patrick Brennan |
| | ) | Trial Judge Presiding |

## AFFIDAVIT IN SUPPORT OF EXHIBIT 3 IN PETIONER'S PLA

I Scott R Foster certify that affiant has read the foregoing affidavit; that the affiant knows

the contents herein; and that if called, affiant could testify that the facts set forth in the

Exhibit 3 are true and correct.

I Scott R Foster further certify : That since 2005, I have been a licensed broker, managing

broker in the State of Illinois, and that I have closed over 250 residential deals of which

133 have been short sales despite having to cope with my late wife's four year battle with

cancer, and being the single father of a six year old after her death, and most significantly

losing well over a million dollars in income because of the costs associated with this case.

Moreover, I have consulted with other agents on another 70 or so short sales. If this

number is combined with above 133 short sales, I have been involved in deals in 71 out

1

of the 77 official neighborhoods in Chicago. Moreover, because of a major closed head injury that was sustained avoiding a head on collision with a wrong way driver on Interstate 94 in Wisconsin, which injury was misdiagnosed, I drove a cab at night in the City of Chicago for approximately five years between late 1976 early 1982. Not until 1984 did I get the correct diagnosis, and did I return to complete my bachelor's degree at Northwestern, where I returned to my previous level of excellence after having failed on three prior occassions, where at one time, I had ranked in the top two percent of the Evans Scholar Program and was a national leader in an environmental group known as SCOPE that met twice a year with Secretary of Interior Walter Hickel. When I returned and graduated from Northwestern, my grad school recommendation was written by Professor Henry Binford, an African American who has spoken at NU's graduation. He wrote that I was the best student he had had in the past five years. I am a white male from Morton Grove, who is decidedly in the middle of the road politically. By contrast, my older sister Joanne is a deep liberal who recently received the Lawyer of the Year Award in 2013 from the National American Indian Housing Council, and my brother Grady is an intense very conservative Libertarian,  Stanford Law Grad (and fellow Evans Scholar) who was the former Chief Economist for the United States Postal Service. Not only that, but as a junior and senior in high school in 1967 and 1968, I delivered plastic furniture covers in the "ghetto" during the colder/non caddying months because none of the other delivery persons wanted to do such, and I was paid a premium to do such. As such, I deeply know and love all of Chicago in a way very few so-called real estate "experts" know. I have access to records in the local MLS, which is known as MRED (Midwest Real Estate Data). And with that data I have used my knowledge of Chicago to find data

2

for those neighborhoods that are African American, and those neighborhoods that are

White. (I have left out neighborhoods in my analysis that are "mixed" or primarily

Hispanic.)

Scott R Foster

STATE OF ILLINOIS        )

COUNTY OF COOK          )

Subscribed and Sworn/Attested Before Me

this date Sept 21, 2018

(Notary's Official Seal)

OFFICIAL SEAL
MARIA HURTADO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/13/20

3

**Exhibit 4**

IN THE

SUPREME COURT OF ILLNIOS

| | | |
|---|---|---|
| PHH Mortgage | ) | Appellate Court First Judicial District |
| Plaintiff Appellee | ) | Case Number 1-17-2170 |
| | ) | |
| v. | ) | Circuit Court Cook County—Chancery |
| | ) | Division |
| Scott R Foster | ) | Case Number 10 CH 48036 |
| Defendant Appellant | ) | The Honorable Daniel Patrick Brennan |
| | ) | Trial Judge Presiding |

AFFIDAVIT IN SUPPORT OF EXHIBIT 4 IN PETIONER'S PLA

I Scott R Foster certify that affiant has read the foregoing affidavit; that the affiant knows

the contents herein; and that if called, affiant could testify that the facts set forth in the

Exhibit 4 are true and correct.

I Scott R Foster further certify : That the statistics cited in the analysis of the changes in

state populations of states neighboring Illinois as well as Illinois are from the United

States Census Web site http://www.census.gov/data/tables/demo/popest/state-total.html

Scott R Foster

STATE OF ILLINOIS          )

1

COUNTY OF COOK  )

Subscribed and Sworn/Attested Before Me

this date Sept 21, 2018

_[signature]_

By Scott R. Foster

(Notary's Official Seal)

OFFICIAL SEAL
MARIA HURTADO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/13/20

2

**Exhibit 5**

IN THE

SUPREME COURT OF ILLNIOS

| | | |
|---|---|---|
| PHH Mortgage | ) | Appellate Court First Judicial District |
| Plaintiff Appellee | ) | Case Number 1-17-2170 |
| | ) | |
| v. | ) | Circuit Court Cook County—Chancery |
| | ) | Division |
| Scott R Foster | ) | Case Number 10 CH 48036 |
| Defendant Appellant | ) | The Honorable Daniel Patrick Brennan |
| | ) | Trial Judge Presiding |

AFFIDAVIT IN SUPPORT OF EXHIBIT 5 IN PETIONER'S PLA

I Scott R Foster certify that affiant has read the foregoing affidavit; that the affiant knows

the contents herein; and that if called, affiant could testify that the facts set forth in the

Exhibit 5 are true and correct.

I Scott R Foster further certify : That I have filed a Fair Debt Collection Practice Act

claim in Federal Court. And that Judge Virginia Kendall would have a strong reason to

believe my credibility as a whistleblower from the outset, since she is a fellow

Northwestern alum. She was a 1984 graduate of the Medill School of Journalism, whose

Dean Ira "Bill" Cole was forced to resign that year because of financial improprieties,

which improprieties were brought to the attention of Crains Chicago Business by me and

my late girl friend, Penny Spoke who worked in his office. (Penny would later go on to

1

get three doctorates.) As such, given Judge Kendall's hardnosed reputation, I have a reasonable degree of confidence that Judge Kendall will order a criminal investigation into the conduct of PHH Mortgage and Tom Belczak with respect to the non existent claimed Notices of Acceleration, and that Tom Belczak will go to Federal Prison.

Scott R Foster

STATE OF ILLINOIS )

COUNTY OF COOK )

Subscribed and Sworn/Attested Before Me

this date Sept 21, 2018

(Notary's Official Seal)

OFFICIAL SEAL
MARIA HURTADO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/13/20

2

**Exhibit 6**

SUBMITTED - 2289486 - Scott Foster - 9/21/2018 12:15 PM

IN THE

SUPREME COURT OF ILLNIOS

| | | |
|---|---|---|
| PHH Mortgage | ) | Appellate Court First Judicial District |
| Plaintiff Appellee | ) | Case Number 1-17-2170 |
| | ) | |
| v. | ) | Circuit Court Cook County—Chancery |
| | ) | Division |
| Scott R Foster | ) | Case Number 10 CH 48036 |
| Defendant Appellant | ) | The Honorable Daniel Patrick Brennan |
| | ) | Trial Judge Presiding |

AFFIDAVIT IN SUPPORT OF EXHIBIT 6 IN PETIONER'S PLA

I Scott R Foster certify that affiant has read the foregoing affidavit; that the affiant knows

the contents herein; and that if called, affiant could testify that the facts set forth in the

Exhibit 6 are true and correct.

I Scott R Foster further certify : That the photo attached to this exhibit is a photo of ONE

fully completed brief in this case as well as the 2800 page Appendix, and that this was

completed nine days after the due date referred to in this matter, despite my illness and

fatigue.

Scott R Foster

1

STATE OF ILLINOIS          )

COUNTY OF COOK          )

Subscribed and Sworn/Attested Before Me

this date _Sept 21, 2018_

_Maria Hurtado_

By   Scott R. Foster

(Notary's Official Seal)

OFFICIAL SEAL
MARIA HURTADO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/13/20

2



EXHIBIT

6
PHOTO

Say something

SUPREME COURT OF ILLNIOS

| | | |
|---|---|---|
| PHH Mortgage | ) | Appellate Court First Judicial District |
| Plaintiff Appellee | ) | Case Number 1-17-2170 |
| | ) | |
| v. | ) | Circuit Court Cook County---Chancery |
| | ) | Division |
| Scott R Foster | ) | Case Number 10 CH 48036 |
| Defendant Appellant | ) | The Honorable Daniel Patrick Brennan |
| | ) | Trial Judge Presiding |

**Appendix**

Form 21*
* Pursuant by Authority of the State of Illinois
10-12/5m/PR13-0842

## IN THE APPELLATE COURT OF ILLINOIS
### FIRST DISTRICT

Present Hon. P. Scott Neville _____ Presiding Justice.

Present Hon. _____ Justice.

Present Hon. _____ Justice.

Thomas D. Palella _____ Clerk.      Tom Dart _____ Sheriff.

PHH MORTGAGE COPR.,

    Plaintiff-Appellee,

No. 1-17-2170 _____ vs.

SCOTT R. FOSTER,

    Defendant-Appellant.

APPEAL FROM CIRCUIT COURT OF
COOK COUNTY

CIRCUIT COURT NO. 10CH48036

A-1

I, **Thomas D. Palella** _____, Clerk of the Appellate Court, in and for the First District

of the State of Illinois, and keeper of the records, files and seal thereof, DO HEREBY CERTIFY, That the foregoing is

a true copy of **A Certain Order Entered April 5, 2018** _____

_____

_____ said Appellate Court in the above entitled

cause, of record in my office.

IN TESTIMORY WHEREOF, I have set my hand and affixed the seal of the

said Appellate Court, at Chicago, this **29th** day of **August**

in the year of our Lord Two Thousand **2018**

*Thomas D. Palella*

Clerk of the Appellate Court of the First District, Illinois

*A-2*

123950

This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Appellate Courts.

| Instructions ▼ | ☐ THIS APPEAL INVOLVES A QUESTION OF CHILD CUSTODY, ALLOCATION OF PARENTAL RESPONSIBILITIES, ADOPTION, TERMINATION OR PARENTAL RIGHTS OR OTHER MATTER AFFECTING THE BEST INTERESTS OF A CHILD. |
|---|---|

Check the box to the right only if it applies to your case.

Enter the appellate court case number.

Just below "In the Appellate Court of Illinois," enter the number of the appellate district where the appeal was filed.

**Appellate Case No.:** 1-17-_MNA_2170

### IN THE APPELLATE COURT OF

### ILLINOIS

1ST DISTRICT    District - SECOND DIVISION

If the case name in the trial court began with "In re" (e.g., "In re Marriage of Jones"), enter that name. Below that, enter the names of the parties in the trial court, and check the correct boxes to show which party filed the appeal ("appellant") and which party is responding to the appeal ("appellee").

In re ☐ _ANN McTIGGUE_
        _v. Scott R. Fs52_

_Scott R. Foston_
**Plaintiff/Petitioner** (First, middle, last names)

☒ Appellant   ☐ Appellee

v.

_ANN McTIGGUE_
**Defendant/Respondent** (First, middle, last names)

☐ Appellant   ☒ Appellee

**Appeal from the Circuit Court**
of _COOK_ County

**Trial Court Case No.:**
10 CV 4802 L

**Honorable**
_David Brennan_
Judge, Presiding

To the far right, enter the trial court county, trial court case number, and trial judge's name.

### ORDER

In 1, check the box that identifies who is filing the Motion.

1. Motion by: ☐ Plaintiff/Petitioner-Appellant   ☐ Plaintiff/Petitioner-Appellee
              ☒ Defendant/Respondent-Appellant   ☐ Defendant/Respondent-Appellee

In 2, enter what you are asking the court to do in response to your Motion. This should be the same as what you asked for in Section 2 of the Motion.

2. Motion for: _GRANT SECOND (LAST EXTENSION TO FILE_
   _INITIAL BRIEF IN SUPPORT OF APPELLANTS APPEAL_
   _AT 1PM JUAN MAY 2, 2018_

3. The motion is: ☒ Allowed   ☐ Denied

**ORDER ENTERED**

4. It is further ordered (if applicable):

DO NOT complete Section 3 or Section 4. The court will complete these sections.

APR 05 2018

DO NOT complete this section. The justices will sign and date here.

**ENTERED** _P. Scott NewMaster_

**APPELLATE COURT, FIRST DISTRICT**

Justice _____   Date _____

Justice _____   Date _____

Justice _____   Date _____

MNA-O 2704.1

Page 1 of 1

A-3

(02/17)

123950

No. 1-17-2170

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PHH MORTGAGE CORP., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 10 CH 48036 |
| | ) | |
| SCOTT R. FOSTER, | ) | Honorable |
| | ) | Daniel P. Brennan, |
| Defendant-Appellant. | ) | Judge Presiding. |

## ORDER

On August 30, 2017, defendant-appellant Scott R. Foster filed a notice of appeal from an

August 3, 2018 order of the circuit court of Cook County approving a report of sale and

distribution in a foreclosure proceeding. Since that date, Foster has received five extensions of

time to file his opening brief. In his fifth motion for extension of time labeled "One More Final

(and entirely justified) Motion for Extension of Time to File Initial Appellate Brief" which was

filed on May 29, 2018, Foster sought a final extension to June 20, 2018. Foster's motion was five,

single-spaced pages. On June 7, 2018, this court granted the motion with the caveat that failure to

file the brief on June 20, 2018, would (not could) result in dismissal of Foster's appeal. On June 18,

2018, Foster filed a sixth motion for extension of time, this time a 10-page, double-spaced

document, in which he again requested another 30 days to file his opening brief. While we are

sensitive to the challenges *pro se* litigants face in representing themselves on appeal, Foster has

been afforded more than ample time to file his brief.

A-4

123950

Because we advised Foster that his failure to file a brief by June 20, 2018 would result in dismissal of this appeal,

IT IS HEREBY ORDERED that this appeal is DISMISSED.

_____
JUSTICE

_____
JUSTICE

_____
JUSTICE

7 - 17 - 2170

ORDER ENTERED

JUN 2 5 2018

APPELLATE COURT FIRST DISTRICT

A-5

Form 214
Printed by Authority of the State of Illinois
10-12/5m/PR13-0842

# IN THE APPELLATE COURT OF ILLINOIS
## FIRST DISTRICT

Present Hon. Mary Ann Mason _____ Presiding Justice.

Present Hon. Aurelia Pucinski _____ Justice.

Present Hon. Michael B. Hyman _____ Justice.

Thomas D. Palella _____ Clerk.    Tom Dart _____ Sheriff.

PHH MORTGAGE CORP.,

    Plaintiff-Appellee,

No. 1-17-2170        vs.

SCOTT R. FOSTER,

    Defendant-Appellant

APPEAL FROM CIRCUIT COURT OF COOK COUNTY

CIRCUIT COURT NO. 10CH48036

*A-6*

I. __Thomas D. Palella_____, Clerk of the Appellate Court, in and for the First District

of the State of Illinois, and keeper of the records, files and seal thereof, DO HEREBY CERTIFY, That the foregoing is

a true copy of __A Certain Order Entered July 27, 2018_____

_____

_____ said Appellate Court in the above entitled

cause, of record in my office.

IN TESTIMONY WHEREOF, I have set my hand and affixed the seal of the

said Appellate Court, at Chicago, this __29th__ day of __August__

in the year of our Lord Two Thousand __2018__

*Thomas D. Palella*

Clerk of the Appellate Court of the First District, Illinois

*A-7*

123950

No. 1-17-2170

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PHH MORTGAGE CORP., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 10 CH 48036 |
| | ) | |
| SCOTT R. FOSTER, | ) | Honorable |
| | ) | Daniel P. Brennan, |
| Defendant-Appellant. | ) | Judge Presiding. |

## **ORDER**

Defendant-Appellant Scott R. Foster requests that we vacate our June 25, 2018 order

dismissing this appeal and afford him another extension of time to file his opening brief. This we

decline to do. From the outset of this appeal, Foster has repeatedly represented to this court that

"the vast majority of the needed work has long since been done in this matter" and that it was

simply a matter of " 'filling in the blanks' with very simple black iron [sic] law' ." Yet, Foster

obtained five extensions of time to "fill in the blanks," each time offering another reason why his

brief was not filed. Even after an extension to May 9th was marked final, this court granted Foster

two more extensions. In the last order entered on June 7, 2018, the court specifically advised

Foster that failure to file his brief by June 20th would result in dismissal of his appeal. After entry

of the order dismissing this appeal on June 25th, Foster waited until July 13, 2018 to file his motion

to vacate the dismissal and, instead of tendering his long overdue brief, requested another 30-day

extension.

A-8

1-17-2170

IT IS HEREBY ORDERED that the motion to vacate is DENIED.

JUSTICE

JUSTICE

JUSTICE

1-17-2170

**ORDER ENTERED**

JUL 2 7 2018

APPELLATE COURT FIRST DISTRICT

A-9





CLERK'S OFFICE
APPELLATE COURT FIRST DISTRICT
STATE OF ILLINOIS
160 NORTH LASALLE STREET, RM S1400
CHICAGO, ILLINOIS 60601

## STATE OF ILLINOIS, FIRST DISTRICT APPELLATE COURT MANDATE

Panel:     Honorable Mary Anne Mason
           Honorable Aurelia Marie Pucinski
           Honorable Michael B. Hyman

BE IT REMEMBERED, that on 25th day of June, 2018 the final judgment of said Appellate Court was entered of record as follows:

PHH MORTGAGE CORPORATION,          General No: 1-17-2170
   Plaintiff-Appellee,             County/Agency: Cook County
   v.                              Trial Court/Agency Case No.: 10CH48036
SCOTT R. FOSTER,
   Defendant-Appellant.

In accordance with Supreme Court Rule 368, this Mandate is issued. As Clerk of the Appellate Court and keeper of the records, files and Seal thereof, I certify that the foregoing is a true statement of the final Order of said Appellate Court in the above cause of record in my office. Pursuant to Supreme Court Rule 369, the clerk of the circuit court shall file the Mandate promptly.



IN WITNESS WHEREOF, I hereunto set my hand and affix the Seal of the Illinois Appellate Court this 28th day of August, 2018.

Clerk of the Appellate Court

A-10

*Respondee 7/2.*

E-FILED
Transaction ID: 1-17-2170
File Date: 7/13/2018 3:01 PM
Thomas D. Palella
Clerk of the Appellate Court
APPELLATE COURT 1ST DISTRICT

No 1-17-2170

## IN THE ILLINOIS APPELLATE COURT
## FIRST JUDICIAL DISRICT

**PHH Mortgage**

Plaintiff -Appellee

v.

Appeal from the Circuit Court of Cook County, Illinois, County Department, Chancery Division

Circuit Court No 10 Ch 48036

The Honorable Daniel Patrick Brennan

Presiding Judge

Date of Notice of Appeal:

August 30, 2017

**Scott R Foster**

Defendant-Appellant

---

**Motion to Vacate Final Order Dismissing Appellant's Appeal, which Motion is filed pursuant to Illinois Supreme Court Rule 361, and which Motion specifically pertains to this Appellate Court's blatant disregard and willful violation of the American Disabilities Act 42 U.S. Code § 12101 (ADA) which has well-known specific protections that pertain to this matter and which protections directly involve the <u>Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.</u>**

---

Now comes Defendant Appellant Scott R Foster ("Foster") and hereby moves that this honorable Appellate Court vacate its Final Order Dismissing Appellant's Appeal. which Motion is filed pursuant to Illinois Supreme Court Rule 361. and which Motion specifically pertains to this Appellate Court's blatant disregard and willful violation of the American Disabilities Act 42 U.S. Code § 12101 (ADA)

$A-11^1$

which has well-known specific protections that pertain to this matter and which protections directly involve the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. In support thereof Foster states:

1) This Motion pertains to this Appellate Court's disregard and violation of the American Disabilities Act 42 U.S. Code § 12101 (ADA) which has well-known specific protections that pertain to this matter and which protections directly involve the **Equal Protection Clause of the Fourteenth Amendment of the United States Constitution**. Specifically, the movant, Scott R Foster ("Foster") has a recognized medical disability known as pre diabetes that has its own medical code, and which condition takes a substantial period of time in one's day to work upon and which work to resolve can even under the best of circumstances take up to a year to resolve. As such, the Appellate Court's refusal to grant additional time in which to allow Foster to file his brief, when Foster's **Motion for Additional Extension of Time to File Initial Appellate Brief for Health Reasons** raised for the **first time** this disability is a willful violation of ADA. Simply put, as a matter of both Federal Law, (and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution), the Appellate Court had and continues to have no choice but to grant Foster the additional time that he sought and continues to seek.

2) Accordingly, this Motion asks that this court reverse its June 25, 2018 Order wherein it dismissed Foster appeal (Exhibit 1) and allow Appellant Scott R Foster (Foster) to file his Initial Appellant brief in thirty days after the entry of

2

A-12

an order allowing Foster to file his brief, Foster's further argument is as
follows:

3) The **United States Constitution** is the Supreme Law of the United States of
America. It was ratified June 21, 1788, and it was effective March 4, 1789
more than 229 years ago.

1) **The 14th Amendment of the United States Constitution** was adopted
on July 9, 1868. The first section of the 14th Amendment (which is
known as the "Equal Protection Clause") reads in its entirety as
follows:

All persons born or naturalized in the United States and subject to the
jurisdiction thereof, are citizens of the United States and of the State
wherein they reside. No State shall make or enforce any law which
shall abridge the privileges or immunities of citizens of the United
States; nor shall any State deprive any person of life, liberty, or
property, without due process of law; nor deny to any person within its
jurisdiction the equal protection of the laws.

2) **The American Disabilities Act (ADA) 42 U.S. Code § 12101** was
signed into law on July 26, 1990

3) Relevant portions of this law as they pertain to this brief are the
following:

## 42 U.S. Code § 12101 - Findings and purpose

(b)PURPOSE It is the purpose of this chapter—

(1)

to provide a clear and comprehensive national mandate for the
elimination of discrimination against individuals with disabilities;

...

$A^3$-13

(4)

to invoke the sweep of congressional authority. including the power to enforce the **fourteenth amendment** [emphasis added] and to regulate commerce. in order to address the major areas of discrimination faced day-to-day by people with disabilities.

## 42 U.S. Code § 12102 - Definition of disability

As used in this chapter:

(1)DISABILITY The term "disability" means. with respect to an individual—

(A)
a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B)
a record of such an impairment…

(2) MAJOR LIFE ACTIVITIES

(A)In general
For purposes of paragraph (1). major life activities include. but are not limited to. caring for oneself. performing manual tasks. seeing. hearing. eating. sleeping. walking. standing. lifting. bending. speaking. breathing. **learning, reading, concentrating, thinking, communicating, and working.** [emphasis added]…

As used in this chapter:

(2) STATE
The term "State" means each of the several States. the District of Columbia. the Commonwealth of Puerto Rico. Guam. American Samoa. the Virgin Islands of the United States. the Trust Territory of the Pacific Islands. and the Commonwealth of the Northern Mariana Islands.

4) Therefore. this court must abide by and enforce ADA—period. Nor.

quite obviously. does this court have any right whatsoever to set aside

A-14

the United States Constitution in any one of its rulings, especially where the constitutionality of such provisions in the ADA with respect to such a common disability has never been challenged.

5) With respect to this court's unquestionably misapplied decision the following is relevant to ADA:

6) The attached letter from Lawrence J Beuret MD (Exhibit 2) makes clear that Scott R Foster has a disability known as prediabetes. Prediabetes is not just a matter of law. but as Dr. Beuret writes is a as medical diagnosis classification that has its own diagnosis code for which one can receive insurance reimbursement and an unquestioned disability as it part or the diabetes diagnosis spectrum. which is worldwide known disability. In particular it has an effect upon common traits of prediabetes such as Foster's learning. reading. concentrating. thinking. communicating. and working not to mention the enormous time and effort that is taken to effectively combat this disease. (See Foster Affidavit attached as Exhibit 5)

7) Therefore. the prior appellate court's order of June 7 (Exhibit 3) while written (and stamped) as a final order means absolutely nothing in the light of Foster's disability simply because Foster only raised for the **first time**. his disability in his motion of June 18. 2018. which motion was titled **Motion For Additional Extension of Time to File Initial Appellate Brief for Health Reason.** (Exhibit 4) which motion

A-15

SUBMITTED - 2289486 - Scott Foster - 9/21/2018 12:15 PM

was filed on a timely basis on June 18, 2018 since the prior order allowed Foster to file his brief as late as June 20, 2018.

8) (Foster readily concedes that the Appellate Court's prior order might have some dispositive impact if Foster had previously invoked his disability in prior requests for extensions of time, but that is not the case in this instance.)

9) In plain, blunt, simple language, it doesn't make any difference how many prior extensions Foster had or whether the last extension was a final order as to an extension for time to file his brief if Foster invokes a disability, which is precisely what occurred here.

10) And if this court wants to rule otherwise, it will permanently stain whatever legacy it may wish to create not to mention earn the chagrin of virtually every self-interest group in the Cook County Area. The list is endless from every conceivable Senior Citizen Organization (since Foster is 67 years old), Law Enforcement Officers, to Medical Groups, to Business Associations, to every major university (including every single law school) in the Chicago area. Indeed, this ruling could put the Greater Chicago area at risk for attracting any kind of business investment as competitors from every other metropolitan area in the country will almost certainly point to this decision as not only an example of at best deep judicial ineptitude in Illinois and a complete disregards for ADA as well but overt hostility toward the disabled.

$A-16$

SUBMITTED - 2289486 - Scott Foster - 9/21/2018 12:15 PM

11) And Foster has the absolute right of appeal to the Federal court system in this matter. which would essentially make the First District Appellate Court look like a version of the South during the Civil Rights Turmoil in the 1960s. wherein Federal Court intervention was repeatedly required to overcome clearly wrong state court decisions.

12) Moreover. as noted. the Fourteenth Amendment in the Equal Protection clause states in its entirety: No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

13) Plain and simple. there is no Final Order protection from the ADA.

14) Indeed. what would this court's ruling be if an appellant lawyer was involved in a disabling accident or had a heart attack such that one could not complete the brief that was also under a final order.

15) To reiterate:

16) There is no question that Foster had a motion before the Illinois Appellate Court. 1st District asking for one final extension to file his Appellate Court brief. which Motion was granted on June 7 2018 and which responsive order gave Foster until June 20. to file his brief (Exhibit 3)

17) But before the due date of the order was final (June 20. 2018). Foster filed an additional motion for more time which motion for the first time raised Foster's prediabetic condition The title of this brief was **Motion For Additional Extension of Time to File Initial Appellate Brief for Health Reasons.** (Exhibit 4) This motion was filed on June

$A$-17

18, 2018. That motion sought an additional 30 days in which to file
Foster's brief. That motion for the **first time** raised the issue of
Foster's pre diabetic condition

18) Moreover there were prior extensions that took into consideration
Foster's injuries sustained in an aggravated battery committed upon
him by three drunk male passengers while he was driving for Uber.
(Exhibit 5)

19) Not only that. but the prior extensions that were given were fact based
that recognized Foster circumstances, which included his
homelessness. which was/is unquestionably due to the
extreme/criminal misconduct of the Plaintiff Appellee PHH
Mortgage. which will be detailed in the Brief. and which Brief will be
nothing short of one of the very best (if not best) of its types pertaining
to the issue of residential foreclosure filed over the last ten years in the
United States of America.

20) Indeed. notwithstanding the almost 2800 page Record on Appeal
Foster's extensions that were given because of Foster's homelessness.
were compelling. To wit: Foster and his now 14 year old daughter
slept at the Edgewater Dunkin Donuts. Northwestern University
Library. two different motels. (at one of which Lucy received severe
bed bug bites) the Red Line. the Brown Line. and the Purple Line. and
primarily in the back of a rental car that Foster used to drive to Uber
for 8 months where his rating was 4.95. and according to Uber. his

A-18

percentage of passenger compliments relative to his five star ratings was among the highest in the nation. (Exhibit 5)

21) This court is further advised that Foster has already put in **650 hours of worked in finishing his brief. These 650 hours do not include the additional 300 hours of work Foster spent doing a sensational forensic financial analysis of a "ledger" that while it was first introduced in the second Motion for Sale, upon which PHH never acted, but was belatedly officially presented by the Appellee PHH Mortgage 6 years and 9 days after the date of the initial foreclosure filing in its third Motion for Sale, wherein the two prior Motions For Sale by PHH were never moved forward upon on for whatever reason.** (Exhibit 5)

22) **This court is also asked to further note that this detailed analysis has been presented to the Attorney General of the United States of America/Department of Justice as part of Foster's False Claim Act (Lincoln Law) claim.** (Exhibit 5).

23) Foster's False Claim Act claim (Lincoln Law) against PHH, is currently being reviewed by the **United States Department of Justice**, but upon which DOJ almost certainly will not move forward on until after the merger of PHH with Ocwen simply because it that there could be such an outbreak of negative publicity that the merger would fail, and as a result there would be a dearth of companies that process third party mortgages. Indeed, PHH is contributing a net of $166 million dollars of its own money for the contemplated purchase by Ocwen of less than $400 million dollars. Why is PHH so deeply at risk? This

A-19

is because in the past year, PHH has had to pay for a $72 million dollar FCA claim on a different matter pertaining to FHA and VA monies "misused" by PHH, and in recent years, PHH has paid $25 million to the State of New York as well another $45 million dollars to 49 Attorney Generals of the United States for robo signing and illegal foreclosures. (Exhibit 5)

24) Moreover, of the $30,000 in legal fees Foster has spent on this matter, $25,000 of that went to paying the legal fees for RDS Law, the husband and wife team of Joanne and Bob Sweeney. Joanne Sweeney was on the team at Jenner and Block that won the largest jury verdict in the history of the United States. Two years ago, Bob Sweeny won the largest verdict for Defamation of Character in the history of Illinois law. Yet the Sweenys felt it was a waste and money to pursue a defense when there came a time when Judge Brennan flat out lied about there having been a required acceleration letter filed, **which lie is contained in a transcript that will be presented to this court the Appellate brief.** (Exhibit 5)

25) Therefore, of the over 100,000 foreclosure filings in Cook County between 2008 and 2016, Foster is no doubt among a handful of foreclosure defendants who had both a court reporter present and a high powered lawyer defending him for part of the trial.

26) Foster would add that as a real estate broker, he has completed about 130 short sales of which approximately 80 were "up against" an imminent judicial sale. So Foster is very familiar with the process, and Foster is also painfully aware that there were some of his clients whose reason for postponing the

10

A-20

judicial sale was for the mere purpose of staying in one's property for another

six or so months and not completing the short sale. (Exhibit 5)

27) Foster is probably the only foreclosure defendant in the last ten years in a

Cook County Foreclosure case who has included a relevant (and meaningful)

transcript of an oral argument before the United States Supreme Court, which

oral argument has DIRECT meaning on this case. This transcript is included

in the Record on Appeal, and part of it is included in the Brief. (Exhibit 5)

28) Foster is probably the only foreclosure Appellant Defendant who has lined up

Amici Curiae from various telephone solicitation organizations that would be

deeply harmed by Judge Brennan's ruling wherein Judge Brennan ruled that

Foster needed to know the name of the person from PHH who promised him

the forbearance, when pursuant to FTC rules, one is not required to give one's

name. These of course will come after the Appellee's Response Brief is filed.

(Exhibit 5)

29) And speaking of the Appellee, maybe the Appellee can explain to this court

why it took 6 years and 9 days after the date of the initial filing to file a third

Motion for Sale, **when the prior two Motions for Sale were not dismissed.**

(Exhibit 5)

30) And beyond that, **maybe the Appellee can produce the required Notice of**

**Acceleration it has not produced in 7 years and 8 months.** (Exhibit 5)

31) And most importantly, maybe the Appellee can defend the records released 6

years and 9 days after the initial filing in this foreclosure case in the

Appellee's third Motion for Sale that absolutely demonstrate that Foster

11

A-21

received his the forbearance that he was promised, and that PHH only reneged

on said promise with the passage of Dodd Frank that was signed into law on

July 21, 2010. (Exhibit 5)

32) Indeed, this is a case where Foster did not owe one dime because the records

released 6 years and 9 days after the filing of the law suit made absolutely

clear that Foster had gotten his forbearance as he had always insisted. Yet

Judge Brennan refused to allow Foster to file a third affirmative defense as

well as counterclaims despite the fact that new material was presented.

(Exhibit 5)

33) Thus, while it is certainly true that Foster has been given other extensions, all

of which were fact based and given with good reason, this Motion perforce

must be granted, unless of course this court wishes to rule that as a **Matter of**

**Law** it feels that it can violate that American Disability Act (ADA), which in

this instance specifically invokes the Fourteenth Amendment of the United

States Constitution.


Wherefore, Appellant Scott R Foster asks that this court vacate its order of

June 26, 2018 and allow Foster to file his Appellate Court Brief with

accompanying required documents 30 days after the entry of the order

allowing Foster to file his Initial Appellant Brief.

Respectfully Submitted

Scott R Foster

5990 North Ridge, Chicago, Illinois 60660

7/13/2018

Date

12

A-22

312 485 9800, ScottFosterGVC@Gmail.com

A

A-23

## Exhibit 1

A-24

No. 1-17-2170

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PHH MORTGAGE CORP., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 10 CH 48036 |
| | ) | |
| SCOTT R. FOSTER, | ) | Honorable |
| | ) | Daniel P. Brennan, |
| Defendant-Appellant. | ) | Judge Presiding. |

## ORDER

On August 30, 2017, defendant-appellant Scott R. Foster filed a notice of appeal from an August 3, 2018 order of the circuit court of Cook County approving a report of sale and distribution in a foreclosure proceeding. Since that date, Foster has received five extensions of time to file his opening brief. In his fifth motion for extension of time labeled "One More Final (and entirely justified) Motion for Extension of Time to File Initial Appellate Brief" which was filed on May 29, 2018, Foster sought a final extension to June 20, 2018. Foster's motion was five, single-spaced pages. On June 7, 2018, this court granted the motion with the caveat that failure to file the brief on June 20, 2018, would (not could) result in dismissal of Foster's appeal. On June 18, 2018, Foster filed a sixth motion for extension of time, this time a 10-page, double-spaced document, in which he again requested another 30 days to file his opening brief. While we are sensitive to the challenges *pro se* litigants face in representing themselves on appeal, Foster has been afforded more than ample time to file his brief.

A-25

Because we advised Foster that his failure to file a brief by June 20, 2018 would result in dismissal of this appeal,

IT IS HEREBY ORDERED that this appeal is DISMISSED.

JUSTICE

JUSTICE

JUSTICE

$1 - 17 - 2170$

**ORDER ENTERED**

JUN 25 2018

APPELLATE COURT FIRST DISTRICT

$A - 26$

# Exhibit 2

A-27

LAWRENCE J. BEURET, M.D., S.C.

1325 Remington Road, Suite C
Schaumburg, IL 60173
Phone: 847-285-1545
Fax: 847-594-6142

To whom it may concern:                                                                 July 9, 2018

Scott Foster (D.O.B 08-10-1950) has been a patient of mine since 1989.  Recently Mr. Foster
has gained significant weight, totaling almost 40 pounds. He gained this weight while engaging
in the following high risk activities: A) Driving for Uber for 70 or more hours a week. (Yes. I
have seen his logs); B) Not exercising; C) Eating about 40 donuts a week at the Edgewater
Dunkin Donuts near Devon and Broadway. He did this because for a period between September
2017 to late April 2018, he often slept in the back of his Uber rental car with his 14 year old
daughter Lucy in back of the Dunkin Donuts Parking lot, where the quid pro quo was for Scott
and his daughter to buy Dunkin Donuts product throughout the day.

Lucy is home schooled, and despite the very challenging times she has faced, she is a well-
balanced child who has been evaluated by her god father, known to Scott from their having
been Northwestern Evans Scholars starting in 1969. He is now a retired Pediatrician and a
former Professor of Pediatrics at Loyola University Medical School.

For the past two months I have made it very clear to Scott that he must return to his healthier
patterns of earlier years – eating correctly and walking a minimum of five miles daily. If he does
this, his medical issues could resolve themselves in approximately one year. Additionally,
please be advised that prediabetes is a recognized medical condition, having a diagnosis code
of R73.03, a billable and specific ICD-10-CM code used to indicate a diagnosis for
reimbursement purposes.

Scott now manifests the following physical symptoms clearly linked to prediabetes:  A) Frequent
urination when he eats sugared foods and does not walk his required five miles a day; B)
Cracked heels and all toes that have developed discoloration; C) A waist size that is 44 inches;
D) A weight of 257 pounds with a 5 foot 11 inch height; E) Significant Peripheral Neuropathy in
his left "pinky" finger; F) Itching, redness, and irritation in the abdominal area adjacent to his
belt; G) a constant redness in his left arm pit; (H) and most significantly fatigue, which limits the
amount of work he can do in any day. As an alumnus of Mayo Clinic, I have advised Mr. Foster
to include the relevant Mayo Clinic web page pertaining to prediabetes as part of his brief.

Sincerely,

Lawrence J. Beuret, M.D.

A-28

This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Appellate Courts.

**Instructions ▼**

Check the box to the right of it applies to your case.

☐ THIS APPEAL INVOLVES A QUESTION OF CHILD CUSTODY, ALLOCATION OF PARENTAL RESPONSIBILITIES, ADOPTION, TERMINATION OF PARENTAL RIGHTS OR OTHER MATTER AFFECTING THE BEST INTERESTS OF A CHILD.

Enter the appellate court case number.

Appellate Case No.: _1-19-2170_   *mcr*

Just below "In the Appellate Court of Illinois," enter the number of the appellate district where the appeal was filed.

# IN THE APPELLATE COURT OF
## ILLINOIS

_First_   District (Second Division)

If the case above in the trial court began with "In re" (e.g., "In re Marriage of Jones"), enter that name. Below that, enter the names of the parties in the trial court, and check the correct boxes to show which party filed the appeal ("appellant") and which party is responding to the appeal ("appellee").

In re   ∿∿∿

_PAA Mortgage_
Plaintiff/Petitioner (First, middle, last names)
☐ Appellant   ☒ Appellee

v.

_Scott Foster_
Defendant/Respondent (First, middle, last names)
☒ Appellant   ☐ Appellee

Appeal from the Circuit Court
of _Cook_ County

Trial Court Case No.: _16 CA 98036_

Honorable ____

Judge, Presiding

ORDER ENTERED
JUN 07 2018

APPELLATE COURT FIRST DISTRICT

---

To the far right, enter the trial court county, trial court case number, and trial judge's name.

In 1, check the box that identifies who is filing the Motion.

In 2, enter what you are asking the court to do in response to your Motion. This should be the same as what you asked for in Section 2 of the Motion.

DO NOT complete Section 3 or Section 4. The court will complete these sections.

DO NOT complete this section. The justices will sign and date here.

## ORDER

1. Motion by: ☐ Plaintiff/Petitioner-Appellant   ☒ Defendant/Respondent-Appellant   ☐ Plaintiff/Petitioner-Appellee   ☐ Defendant/Respondent-Appellee

2. Motion for: (Extension) One More Final (and last/el justified) motion for Extension of Time in which to file Initial Appellate Brief

3. The motion is: ☒ Allowed   ☐ Denied

4. It is further ordered (if applicable): Appellant's brief shall be filed on or before June 30, 2018. Failure to file will result in dismissal of the appeal.

ENTERED
_[signature]_
Justice ____

THIS IS A
FINAL
EXTENSION

Justice ____   Date ____

Justice ____

MNA-O 2704.1

Page 1 of 1   (02/17)

_A-29_

# Exhibit 4

A-30

SUBMITTED - 2289486 - Scott Foster - 9/21/2018 12:15 PM

123950

No 1-17-2170

## IN THE ILLINOIS APPELATE COURT

### FIRST JUDICIAL DISRICT

**PHH Mortgage**

     **Plaintiff -Appellee**

|  |  |
|---|---|
|  | **Appeal from the Circuit Court of Cook County, Illinois, County Department, Chancery Division** |
| **v.** | **Circuit Court No 10 Ch 48036** |
|  | **The Honorable Daniel Patrick Brennan** |
|  | **Presiding Judge** |
|  | **Date of Notice of Appeal:** |
| **Scott R Foster** | **August 30, 2017** |

     **Defendant-Appellant**

---

**Motion For Additional Extension of Time to File Initial Appellate Brief for Health Reasons**

**Scott R Foster**

     **Non Attorney Pro se**

     **5990 North Ridge, Chicago, Illinois 60660**

     **312 485 9800**

---

Motion For Extension of Time to File Brief for Health Reasons

Now comes Appellant Scott R Foster and hereby moves that this honorable court grant him 30 additional days to submit his initial appellate brief, which brief would then be due on July 17, 2018.

In support thereof, Foster states:

A-31

NB.    While Foster has no doubt tried the patience of this court with his previous lengthy

requests for additional time. Foster is asking that this court read this entire brief as it will set the

stage for an upcoming motion from Foster that asks this court on its own to at the very least file

an immediate complaint with the State of Illinois Judicial Inquiry Board (JIB) as to the conduct

of Judge Daniel Patrick Brennan who in ruling on this matter in 2017 willfully disregarded the

ruling of this very court in **Cathay Bank v. Accetturo 2016 Il App (1st) 152783 September 30,**

**2016**. The ruling in the above case is not merely analogous to an issue presented in this matter. It

is **identical** to an issue presented in this matter!!!!!!

1):    As previously mentioned, Foster drove for Uber (and Lyft) during an eight month period

from  September 2017 to April 2018 to the extent that his typical work week was 70 to 80 hours

a week.

2):    Foster as previously demonstrated to this court was an outstanding driver as rated by

Uber customers, and in turn this allowed Foster and his then 13 year old daughter to live in a safe

motel in Chicago, (which is where Foster still resides) at 5990 North Ridge

3):    But during this period of driving, Foster gained 35 pounds, and Foster is now

experiencing the very real symptoms of pre diabetes. (Please see Affidavit as attached at Exhibit

1)

4):    Foster had previously had these symptoms, and just before he began to drive he was

walking on average ten miles a day and losing a lot of weight, which weight gain corresponded

to his late wife having her stomach resectioned into replacing her esophagus in 2007 after she

was diagnosed with cancer of the esophagus and she being forced to eat six to eight times a day

in order to literally live (Even eating 8 times a day left Halina at 100 pounds at 5'9" as opposed

A-32

to being 135/140 very athletic pounds. Foster gained 50 pounds eating eight meals a day to keep Halina eating. This came just after Foster was still swimming on occassion 2 miles a day even as a 55 year old.

5): But raising a six year old beginning in 2011 and working 80 hours a week as a successful real estate broker did not provide Foster enough time to lose the weight until last year when Foster's daughter was old enough to stay by herself and Foster was legally allowed to let her to be alone by herself.

6): So Foster is now able to walk five miles a day and eat well, which should "do the trick." But this requires additional time to "do the trick". And given that this is a health issue that pertains directly to the time required to finish this appeal. Foster feels that this alone is sufficient for this court to grant Foster more time

7): Just as importantly, Foster also wants to submit such a truly superior and meaningful brief, that the brief goes further in protecting the rights of Cook County's homeowners as well as the common welfare of every citizen in Cook County.

8): Foster is well aware of this honorable's court sensational decision in **Cathay Bank v. Accetturo 2016 Il App (1ˢᵗ) 152783 September 30, 2016**. And fundamental to the decision was the issue of an acceleration notice not being served upon the Defendant Accetturo. (In the case of Accetturo, there was a specific notice of Intent to Accelerate sent but no Notice of Acceleration was sent. In this matter, there was not even a Notice of Intent to Accelerate much less a Notice of Acceleration.) To the contrary, PHH and its attorneys have endlessly verbigerated the same lie over and over. That lie is the law firm of Shapiro Kreisman endless not stop lie that a Notice of Intent to Foreclose is the same document as **both** A Notice of Intent to

A-33

Accelerate and a Notice of Acceleration. (Quite obviously, PHH is about 14 centuries late, given that English first became a language no later than the 7th Century) Therefore, this case is better than a slam dunk.

9):     At the risk of sounding sycophantic, the decision of this court in **Cathay** has in part staunched the flow of wrongful foreclosures, and Foster (who really is an expert in Chicago Real Estate pricing) fully expects prices in Chicago to regain momentum as there is always a two year lag with respect to decisions as above. Indeed, as previously noted, Foster is back practicing real estate, and Foster has noted a significantly different approach by the judge before whom Foster's short sale client has appeared. And yes the, price of a house in Auburn Gresham has an influence on the price of a house in Lincoln Square. Nevertheless, the damage has already been done and is still in place as Chicago leads the nation in "underwater" homes.

10):     And what is beyond an outrage in this case is that this case "came down" on September 30, 2016, and therefore the foreclosure courtrooms in Cook County were required to follow this ruling. And in whose courtroom was this case? None other than the Honorable Daniel Patrick Brennan, the very same judge in the case that is being reviewed in this matter.

But even though this alone demands reversal of the trial court's ruling, there are even more important issues that are being brought to this court that demand perfection from the Appellant, which perfection perforce must include perfect grammar as the result of Foster paying for a graduate school level proof reader as well as perfect form with respect to Appellate proceedings/filings that are to be reviewed by one of Foster's aforementioned legal experts.

Together, those these two tasks are going to require more money and time that Foster originally had budgeted.

A-34

Next in this brief, are a number of topics that Foster feels could reasonably end up being reviewed by the Illinois Supreme Court. Foster will touch upon each one briefly. And for the sake of so many wonderful people, Foster wants to do his very best just because that is the kind of person he is. But the most compelling (and profoundly heartbreaking) issue raised by Foster will be at the end of this brief wherein Foster raises the issue of the catastrophic devastation every single citizen of Cook County has suffered at the hands of the dirtiest mortgage servicer to practice in Cook County, the dirtiest foreclosure law firm ever to practice in Cook County, and it now appears perhaps the most flagrantly disgraceful foreclosure judge to ever serve in Cook County, who willfully thumbs his nose at this very court.

As this court will soon see, the loss to Cook County tax collections as the direct result of having Daniel ("Rubber Stamp") Brennan on the bench is such that by himself alone, Daniel Patrick Brennan has cost Cook County property tax collections one quarter of a billion dollars over the past five years, and that the loss in Cook County home values (relative to any other of the 19 metropolitan areas as measured by the Case Shiller Index) has resulted in a loss as of the most recent measurement of $2.5 Billion Dollars solely as a result of Daniel Patrick Brennan's rubber stamping . Therefore, Daniel Patrick Brennan may be correctly referred to as the "One Quarter of a Billion Dollar Man" or the $2.5 Billion Dollar Man depending upon one's preference. But there is an even more compelling issue that Foster is now raising. And that is the real cost in blood/human lives that has resulted from Daniel Patrick Brennan's applying a rubber stamp when even going so far as to willfully disobeying this court's clear and unambiguous directive. The reasoning that Foster is using is very simple; In poor and working class neighborhoods, the people who "hold things together" are the biggest stake holders--the owners of single family homes or small multi unit properties. And when a neighborhood loses those stakeholders (as has



A-35

been documented in African American neighborhoods by a recent series of investigative articles by the Chicago Tribune) then there will be an increase in crime. which crime has been clearly documented in the greater number of murders over the past few years in those very neighborhoods that saw the greatest numbers of foreclosures.

Indeed, it is very possible that this court may come to the fact (and law) based conclusion that there may not have been a combination of a dirty lender, with a dirty law firm, with a flagrantly defiant judge who together as a result of their filthy, dirty, fetid coordinated conduct have done more damage to the truly great City of Chicago than any other similarly sized trio of miscreants, which damage to the City of Chicago is only marginally surpassed by the Great Chicago Fire of 1871, which caused an inflation adjusted $4,000,000,000 in damages. (Damage of 1871 Fire was estimated at $200 million in 1871 dollars)

The issues raised in this matter that could be brought up to the Illinois Supreme Court are as follows: 1); What is acceptable judicial conduct to the point where it is no longer mere error but outright corrupt behavior? 2); Does there need to be an enhancement/clarification of recently added Illinois Supreme Court Rules 113 and 114, which rules have been implemented to prevent foreclosure abuse? 3); Does there need to be resolution of a potential conflict between the following two Illinois Appellate Court decisions that might be argued are in conflict with this court's wonderfully written and reason ruling in ? 4); What level of legal misconduct by an attorney is required insofar as various sanctions are concerned including in this instance the loss of Attorney Tom Belczak's license? 5); How is it humanly possible for a judge to rule that in order to plead telephone fraud in the State of Illinois, that one must know the name of the person to whom one spoke when Federal Law makes clear that a telephone solicitor/representative does not even need to give one's name? (Indeed, it is clear that United States Supreme Court (and

A-36

derivatively the Illinois Supreme Court) has already made clear that one does not need to know the name of the telephone representative, notwithstanding the fact that Judge Brennan ruled otherwise.) 6); What level of corporate submission of documents via "official representatives" is appropriate such that these documents can be submitted without questions such that discovery cannot as a matter of law be conducted? 7); The next issue that could end up before the Illinois Supreme Court is whether a required hearing pursuant to Illinois law with respect to a Motion to Substitute a Judge for Cause is truly required or whether the judge assigned to hear the motion can merely ignore this requirement as was done in this matter? 8); The final issue also pertains to Supreme Court Rules 113 and 114, and which issue is most likely to catch the attention of the Illinois Supreme Court (in addition to being the most important legal issue in this appeal insofar as the finances of Cook County Government is concerned) is whether there are additional specific measures that can be put in place to insure that lenders are honest such that there would be a requirement that would require lenders to explain each and every code in the records of a foreclosure action or for that any other kind of debt collection action by any kind of debt collector in the State of Illinois.)

And centerpiece of these important issues is that this court will be asked to truly comprehensively understand the major fact issue that most demands a reversal, which issue occurred 3 years and 333 days after the initial filing of the lawsuit. Specifically, only with the Appellee's Third Motion For Sale, did the Appellee release an all-important ledger that when combined with other documents submitted by PHH clearly shows not only clear cut exculpatory evidence as to its claim against the Appellant but a huge seven figure counterclaim that Foster has against PHH. These codes in Foster's records clearly show that Foster was given forbearance as he has always insisted, and that various self-described "document signers" (whom PHH calls

A-37

vice presidents) willfully committed fraud when signing various sworn affidavits. Obviously, when the codes are verified (most likely through an upcoming FDCPA claim to be filed against Herbas's law firm in Federal Court, which requires near immediate discovery) criminal charges will be filed. Or it could be even before on an FCA claim that Foster has before DOJ, but Foster's suspicion is that DOJ first wants to see a completion of the PHH/Ocwen merger.

Therefore, Foster's request for additional time is reasonable.

But with respect to the 5 million plus residents of Cook County, what matters most is that the horrific beating of housing prices stops in Cook County, which could continue for another round given that currently about 57 percent of all mortgages being written are not written by banks, which in turn could potentially mean an catastrophe of even greater magnitude with respect to foreclosures as there could not be any QE1, QE2 or QE Infinity with private lenders as there was during the market collapse previous to this. And with an ever increasing Gini Coefficient Index in the United States, America could find itself in a position where previous stable middle class families are no longer able to pay for their once affordable mortgages. Thus, the "party" is a long way from being over.

And it is to this final issue to which Foster turns in support for his request for additional time.

This court is advised that the Case Shiller Index is a composite of housing prices in 20 metropolitan areas throughout the United States. The base index was 100 for each city beginning in 2000 shortly after Gramm Leach Bliley was signed into law.

Since mid 2008 (ten years ago just as the great recession was beginning and housing prices had not yet cratered), the composite 20 city index has overcome its slump in the following years after 2008 and recovered from 172 to 208, an increase of 20 percent.

A-38

Of the 20 cites 19 cities have higher increases in the Case Shiller Index over this time period

The only city that did not recover from 2008 index 10 years ago is Chicago, which current Case Shiller reading is 92 percent of what it was ten years before.

New York City is only slightly above its level of ten years ago.

Therefore, Chicago would need a nine percent increase just to catch up to New York

But here is where it truly gets to be both heartbreaking and enraging. If Chicago had merely had the average change of New York metropolitan area and been at even over the past ten years in terms of Case Shiller., the following would have been true of the Chicago area: Instead of an average home value of value of $218,000, it would be around $238,000. That is an average difference in value of $20,000 per unit. Or given that there are approximately 1.1 million homes in Cook County, this means that the current net aggregate loss in home value in large part because of excessive foreclosures is a staggering $22,000,000,000 Moreover, if one assigns a mere 12 percent of these foreclosures to Daniel Patrick Brennan, that means that over the course of this crisis, he alone has carved out $2.6 billion dollar in lower property value as a result of his rubber stamp approach with degenerate scum at PHH leading the way. But the worst part of this is that the tax rate for the average home in Cook County is $4300. If that tax were increased by the same nine percent, it would result in an additional tax of approximately $390, which in turn would have netted the various taxing bodies in one year alone $425,000,000, which if one assigns a mere 12 percent to Judge Brennan means that the cost of his sitting on the bench and rubberstamping foreclosures, is $51,000,000 a year for at least the past five years or one quarter of a billion dollars over the past five years that is assignable to Judge Brennan alone. And this

A-39

court is merely asked to assume that the average homeowner would gladly take a $390 hit on one's taxes for a legitimate increase in home value of $20,000.

So this would make Judge Brennan the one quarter of a billion dollar man. Therefore this flagrant disobedience of this very court's own rulings need to stop before it destroys this county.

Wherefore, Appellant Scott R Foster respectfully requests that this honorable court give him an additional 30 days to file his brief in this matter such that a truly superior and meaningful brief, which brief goes further in protecting the rights of Cook County's homeowners is filed.

Respectfully Submitted


Scott R Foster                                      Date

Scott R Foster
5990 North Ridge
Chicago, Illinois 60660


A-40

No 1-17-2170

## IN THE ILLINOIS APPELLATE COURT
### FIRST JUDICIAL DISRICT

**PHH Mortgage**

      **Plaintiff -Appellee**

|  |  |
|---|---|
| v. | Appeal from the Circuit Court of Cook County, Illinois, County Department, Chancery Division |
|  | Circuit Court No 10 Ch 48036 |
|  | The Honorable Daniel Patrick Brennan |
|  | Presiding Judge |
|  | Date of Notice of Appeal: |
| **Scott R Foster** | **August 30, 2017** |
|     **Defendant-Appellant** |  |

---

### Affidavit

I Scott Foster on oath affirm that:

I am unquestionably right at the border of or over the cusp of being diabetic.

Currently. I have had a blood draw that puts me right on the edge.

And to some extent I have only myself to blame.

But there is no question that my driving for Uber and me and my daughter sleeping in the back of the rental car that I used to drive for Uber and which car was parked (with permission) by the Manager of the Dunkin Donuts at Broadway and Devon contributed to this condition as Dunkin allowed me and my daughter to stay there as long as product was purchased throughout the day.

Obviously, we are now in a "much better space"

But I need to commit to a healthy regimen, which includes walking five miles a day every day and eating healthy foods like organic kale every day so that I consistently shed unhealthy avoirdupois.

In turn, this will take time that I previously had "budgeted" for completing my appellate brief.

$A$-4//

the event that there is an objection from the Appellee, I can only suggest the Appellee and the Notice of Acceleration that they have never provided as well as a Notice of Intent to Accelerate both of which are REQUIRED documents. After all there is a 2800 page Record on Appeal, and maybe it is "floating around" as was claimed to exist by Judge Brennan in a court transcript.

After all Mr. Herbas is the managing attorney for the law firm on record in this appeal.

So maybe Mr. Herbas can find these documents in the Record on Appeal. But probably not.

Further Affiant Sayeth Not

Scott Foster

6/8/2018

Date

18th Day of June 20, 18
Cook, County of Cook, State of Illinois

MUHAMMAD FAUJDAR
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
December 09, 2021

A-42

Exhibit 5

A-43

123950

No 1-17-2170

# IN THE ILLINOIS APPELLATE COURT
## FIRST JUDICIAL DISRICT

**PHH Mortgage**

      **Plaintiff -Appellee**

                    **Appeal from the Circuit Court of Cook County, Illinois, County Department, Chancery Division**

v.                     **Circuit Court No 10 Ch 48036**

                    **The Honorable Daniel Patrick Brennan Presiding Judge**

                    **Date of Notice of Appeal: August 30, 2017**

**Scott R Foster**              **Scott R Foster Pro Se Non-Attorney 5990 North Ridge, Chicago, Illinois 60660**

      **Defendant-Appellant**

                    **Oral Argument Requested**

## Affidavit of Scott R Foster

I Scott R Foster on oath affirm that:

1) As the attached letter from Lawrence J Beuret MD makes clear, I have disability known as prediabetes. Prediabetes is a medical diagnosis classification that is both a classified illness that has its own diagnosis code for which one can receive insurance reimbursement and an unquestioned disability as it part or the diabetes diagnosis, which is a disability known worldwide.

2) In particular it has an effect upon my "learning. reading. concentrating. thinking. communicating. and working." . not to

A-44

mention the enormous time and effort it takes to effectively combat

this disease. And given my current condition this issue will take a year

to resolve itself if I really work hard on a daily basis

3) Notwithstanding the almost 2800 page Record on Appeal and the time

it takes to work through such material and finish a first rate brief that

raises some issues heretofore not raised in the Illinois Appellate Court,

my extensions to file the Initial Brief in part were given because of my

homelessness, during which time of homelessness, I and my now 14

year old daughter, Lucy slept at the Edgewater Dunkin Donuts,

Northwestern University Library, two different motels, (at one of

which Lucy received severe bed bug bites) the Red Line, the Brown

Line, and the Purple Line, and primarily in the back of a rental car that

I used to drive to Uber for 8 months where my rating was 4.95, and

according to Uber, my percentage of passenger compliments relative

to my five star ratings was among the highest in the nation.

4) A second reason I was given extensions is because I was the victim of

an aggravated battery when I was the victim of an aggravated battery

by three drunken males whom I was driving for Uber. It is an

aggravated battery because I am 67 years old.

5) Furthermore. I have already put in **650 hours of work in finishing my**

**brief. These 650 hours do not include the additional 300 hours of**

**work I had previously spent doing a sensational forensic financial**

**analysis of a "ledger"  that while it was first introduced in the**

$\overset{2}{A}$-4/5

second Motion for Sale by PHH (upon which PHH never acted),
but which ledger was belatedly officially presented by the Appellee
PHH Mortgage 6 years and 9 days in its third Motion for Sale
prior to the initial filing of the foreclosure law suit against me,
wherein the two prior Motions For Sale were never moved
forward.

6) I have also presented this detailed forensic analysis to the Attorney
General of the United States of America/Department of Justice as
part of my False Claim Act (Lincoln Law) claim.

7) My False Claim Act claim (Lincoln Law) against PHH, is currently
being reviewed by the United States Department of Justice, but
upon which I believe almost certainly DOJ will not move forward on
until after the merger of PHH with Ocwen simply because at the very
least, there would be such an outbreak of negative publicity that the
merger would fail, and as a result there would be a dearth of
companies that process third party mortgages.

8) Indeed my readings have indicated that PHH is contributing a net of
$166 million dollars of its own money for the contemplated purchase
by Ocwen of less than $400 million dollars. If one were to ask as to
why is PHH so deeply at risk and so cheap, this is because in the past
year, PHH has had to pay for a $72 million dollar False Claim Act
claim on a different matter pertaining to FHA and VA monies
"misused" by PHH, and in recent years, PHH has paid $25 million to

$A-46$

the State of New York as well another $45 million dollars to 49

Attorney Generals of the United States, both of which payments were

for robo signing and illegal foreclosures.

9) Moreover, of the $30,000 in legal fees I have spent on this matter,

$25,000 of that went to paying the legal fees for RDS Law, the

husband and wife team of Joanne and Bob Sweeney. Joanne Sweeney

was on the team at Jenner and Block that won the largest jury verdict

in the history of the United States. Two years ago, Bob Sweeny won

the largest verdict for Defamation of Character in the history of Illinois

law.

10) Yet I know the Sweenys felt it was a waste and money to pursue a

defense when there came a time when Judge Daniel Patrick Brennan

flat out lied about there having been a required acceleration letter filed,

**which lie is contained in a transcript that will be presented to this**

**court in my Appellate brief.**

11) Therefore, of the over 100,000 foreclosure filings in Cook County

between 2008 and 2016, I believe that I am among a handful of

foreclosure defendants who had both a court reporter present and a

high powered lawyer defending him for part of the trial.

12) I would add that as a real estate broker, I have completed about 130

short sales of which approximately 80 were "up against" an imminent

judicial sale. So I am very familiar with the process, and I am also

painfully aware that there were some of my clients whose reason for

$\overset{4}{A}$-47

postponing the judicial sale was for the mere purpose of staying in one's property for another six or so months and not completing the short sale.

13) I believe that I am probably the only foreclosure defendant in the last ten years in a Cook County Foreclosure case who has included a relevant (and meaningful) transcript of an oral argument before the United States Supreme Court, which oral argument has DIRECT meaning on this case. This transcript is included in the Record on Appeal, and part of it will be included in the Brief

14) I believe that I am probably the only foreclosure Appellant Defendant who has lined up Amici Curiae from various telephone solicitation organizations that would be deeply harmed by Judge Brennan's ruling wherein Judge Brennan ruled that I needed to know the name of the person from PHH who promised me the forbearance, when pursuant to FTC (Federal Trade Commission) rules, one is not required to give one's name. These of course will come after the Appellee's Response Brief is filed.

15) And speaking of the Appellee, I am wondering if maybe the Appellee can explain to this court why it took 6 years and 9 days after the date of the foreclosure filing against me and my late wife to file a third Motion for Sale, **when the prior two Motions for Sale were not dismissed.**

A-48

16) And beyond that, I am wondering if **maybe the Appellee can produce the required Notice of Acceleration, which required Notice, it has not produced in what is now 7 years and 8 months!**

17) And most importantly, I am wondering if maybe the Appellee can defend the records released 6 years and 9 days after the initial foreclosure filing against me and my late wife, which records are included in the Appellee's third Motion for Sale, and which records absolutely demonstrate that I received the forbearance that I was promised, and that PHH only reneged on said promise with the passage of Dodd Frank that was signed into law on July 21, 2010.

18) Indeed, this is a case where I did not owe one dime because the records released 6 years and 9 days after the filing of the law suit made absolutely clear that I had gotten my forbearance as I had always insisted. Yet Judge Brennan refused to allow me to file a third affirmative defense as well as counterclaims despite the fact that new material was presented.



Further Affiant Sayeth Not

X cott Ryder Foster

Scott R Foster
5990 North Ridge, Chicago, Illinois 60660
312 485 9800, ScottFosterGVC@Gmail.com

7/13/2018

Date

A-49

This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Appellate Courts.

| Instructions ▾ | ☐ THIS APPEAL INVOLVES A QUESTION OF CHILD CUSTODY, ALLOCATION OF PARENTAL RESPONSIBILITIES, ADOPTION, TERMINATION OF PARENTAL RIGHTS, OR OTHER MATTER AFFECTING THE BEST INTEREST OF THE CHILD. |
|---|---|

Use white paper for this cover page.

Check the box to the right if applicable.

Enter the Appellate Court case number.

Appellate Case No.: _L-A-2130_

**IN THE APPELLATE COURT OF ILLINOIS**

Just below "In the Appellate Court of Illinois," enter the number of the appellate district where the appeal was filed.

_First District_ **District**

Enter the names of the parties as they appear on the trial court order being appealed.

_PHA Mortgages_

Plaintiff/Petitioner (First, middle, last names)

☐ Appellant ☒ Appellee

**Appeal from the Circuit Court**
of _Cook_ **County**

**Trial Court Case No.:**
_16 CA - 4801_

The person who filed the appeal is the "appellant" and the person responding to the appeal is the "appellee." Check the correct box for each person.

v.

_Scott R Foster_

Defendant/Respondent (First, middle, last names)

☒ Appellant ☐ Appellee

**Honorable** _Rosni Bonnie Brown_

**Judge, Presiding**

To the far right, enter the trial court county, trial court case number, and trial judge's name.

---

See How To Prepare and File a Proof of Service & Affidavit of Mailing for the difference between Proof of Service and Affidavit of Mailing.

**PROOF OF SERVICE & AFFIDAVIT OF MAILING (APPEAL)**

**PROOF OF SERVICE TO THE PARTIES**

In 1, fill in the name of the document you are sending to the other parties.

1. I am sending the _Motion To Vacate Final Case Judgment Appeals - 3 Appeal_

In 2, fill in the date you are sending the document to the other parties.

2. On: _7 / 13_ , 20 _18_
   Date

In 3, fill in the time you are sending the document to the other parties.

3. At: _3:00_ ☐ a.m. ☒ p.m.
   Time

In 4, fill in the full name and address of the party or lawyer to whom you are sending the document and check the box to show how you are sending it.

4. To:
   Name: _Joe_ _Rodgers_
   First    Middle    Last
   _Atty_

   Address: _200 N Lasalle_ _Chicago_ _Il_ _60601_
   Street, Apt #    City    State    ZIP

   By: ☐ Personal hand delivery
   ☒ Regular, First-Class Mail, deposited into the U.S. Mail with postage paid at:
   _H13 W hewson Chicago Il 60656_
   Address of Post Office or Mailbox

PSA-A 1603.2    Page 1 of 3    (11/16)

_A-50_

123950

Enter the Case Number given by the Appellate Court Clerk: _____

☐ Third-party commercial carrier, delivered to:

_Name (for example, FedEx or UPS ) and office address_

☐ Email
Sender's address: _____ @ _____
Recipient's address: _____ @ _____

☐ Fax
Sender's number: _____
Recipient's number: _____

☐ Mail from a correctional institution, deposited into:

_Place of deposit into institutional mail_

**CAUTION: You may send the document by email or fax only if the other party has agreed to receive documents in the lawsuit by email or fax.**

**If there is a second party or lawyer to send the document to, fill in their name and address here and check the box to show how you are sending it.**

To:
Name: _____
   _First_        _Middle_        _Last_

Address: _____
   _Street, Apt #_        _City_     _State_    _ZIP_

By:
☐ Personal hand delivery
☐ Regular, First-Class Mail, deposited into the U.S. Mail with postage paid at:

_Address of Post Office or Mailbox_

☐ Third-party commercial carrier, delivered to:

_Name (for example, FedEx or UPS ) and office address_

☐ Email
Sender's address: _____ @ _____
Recipient's address: _____ @ _____

☐ Fax
Sender's number: _____
Recipient's number: _____

☐ Mail from a correctional institution, deposited into:

_Place of deposit into institutional mail_

**If there are more than 2 parties or lawyers to whom you must send the document, fill out and attach an Additional Service List and check to box.**

☐ I have listed additional parties or lawyers on the attached _Additional Service List_ form.

## AFFIDAVIT OF MAILING TO THE COURT

**\*\*Fill in sections 5-8 only if you are filing the document with the court clerk by U.S. Mail or third-party commercial carrier\*\***

**Step 1**
Fill out the _Affidavit of Mailing_ only if you are filing the document with the court clerk by U.S. Mail or third-party commercial carrier.

In 5, fill in the name of the document you are sending to the court clerk's office for filing.

5. I filed the _____

A-51

       Page 2 of 3        (11/16)

SUBMITTED - 2289486 - Scott Foster - 9/21/2018 12:15 PM

Enter the Case Number given by the Appellate Court Clerk _____

In 6, fill in the date you are depositing the document in the U.S. Mail, or giving the document to a third-party commercial carrier, or depositing the document into institutional mail.

6. On: _____ , 20. _____
   Date

7. At: _____  ☐ a.m.  ☐ p.m.
   Time

In 7, fill in the time you are depositing the document in the U.S. Mail, or giving the document to a third-party commercial carrier, or depositing the document into institutional mail.

8. By: ☐ Regular, First-Class Mail, deposited into the U.S. Mail with postage paid at:

   _____
   Address of Post Office or Mailbox

   ☐ Third-party commercial carrier, delivered to:

In 8, check the method you are using to send the document to the court clerk's office for filing.

   _____
   Name (for example, FedEx or UPS) and office address

   ☐ Mail from a correctional institution, deposited into:

In 9, fill in the court's name and the address of the court clerk's office where you are sending the document for filing.

   _____
   Place of deposit into institutional mail

9. To: _____
   Clerk of the _____
                 Name of Court

   Address of Clerk's Office: _____
                              Street            City          State      ZIP

**CERTIFICATION**

Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony.

I certify that everything in the *Proof Of Service & Affidavit Of Mailing (Appeal)* is true and correct. I understand that making a false statement on this form is perjury and has penalties provided by law under 735 ILCS 5/1-109.

_Scott R. Foster_                    _5906 N Ridge_
Your Signature                        Street Address

After you finish this form, sign and print your name.

_Scott R. Foster_                    _Chicago, Ill 60660_
Print Your Name                       City, State/ZIP

Enter your complete current address and telephone number.

                                     _312 495-9900_
                                      Telephone

A-52

SUBMITTED - 2289486 - Scott Foster - 9/21/2018 12:15 PM

Form 214
Printed by Authority of the State of Illinois
10-12/5m/PR13-0842

# IN THE APPELLATE COURT OF ILLINOIS
## FIRST DISTRICT

Present Hon. _____ Presiding Justice.

Present Hon. _____ Justice.

Present Hon. _____ Justice.

Thomas D. Palella _____ Clerk.    Tom Dart _____ Sheriff.

PHH Mortgage,

   Plaintiff-Appellee,

No. 1-17-2170 _____ vs.

SCOTT R. FOSTER,

   Defendant-appellant.

APPEAL FROM CIRCUIT COURT OF
COOK COUNTY

CIRCUIT COURT NO. 10CH48036

A-53

123950

I, **Thomas D. Palella** _____, Clerk of the Appellate Court, in and for the First District

of the State of Illinois, and keeper of the records, files and seal thereof, DO HEREBY CERTIFY, That the foregoing is

a true copy of **Motions Filed on 4-2-18 & 7-13-18** _____

_____

_____ said Appellate Court in the above entitled

cause, of record in my office.

IN TESTIMONY WHEREOF, I have set my hand and affixed the seal of the

said Appellate Court, at Chicago, this **29th** day of **August**

in the year of our Lord Two Thousand **2018**

*Thomas D. Palella*

Clerk of the Appellate Court of the First District, Illinois

A-54

E-FILED
Transaction ID: 1-17-2170
File Date: 4/2/2018 3:17 PM
Thomas D. Palella
Clerk of the Appellate Court
APPELLATE COURT 1ST DISTRICT

No 1-17-2170

## IN THE ILLINOIS APPELATE COURT

### FIRST JUDICIAL DISRICT

**PHH Mortgage**

        **Plaintiff -Appellee**

**Scott R Foster**

        **Defendant -Appellant**

**Appeal from the Circuit Court of Cook County, Illinois**

**County Department, Chancery Division Circuit Court**

**PHH Mortgage v. Scott R Foster**

**No 10 Ch 48036**

**Date of Notice of Appeal:**       **August 30, 2017**

---

**Motion to grant second (and last) extension to File Initial Brief in Support of Appellant's Appeal no later than May 2, 2018**

---

    Now comes Plaintiff-Appellee Scott R Foster, and hereby moves this honorable court to grant him until May 2, 2018 to file his initial brief in support of the above referenced appeal. In support thereof Foster states:

    1):    Please know that this second request is solely due to unforeseen financial circumstances that has befallen Foster. Foster is NOT asking for the additional time in order to get an attorney. Rather this request is to get his initial brief filed. Moreover, the vast majority of the needed work has long since been done on this matter, and it truly is a matter of "filling in the

$A \cdot JJ$

blanks" with very simple "black iron law". Nor is this done to for purposes of delay as the property has long since been sold. Most importantly, Foster asks that this honorable truly take the time to read through this motion thoroughly.

2): Indeed, Foster was represented by two sets of terrific attorneys in this process, the last of which was Mr. Steve Rotuno who initially represented Mr. Foster in this appeal but who needed to withdraw because of a conflict. At trial Foster was represented for a long period of time by RDS Law, a husband and wife team. They were truly superb representatives. Joanne Sweeney was on the team at Jenner and Block that won the largest jury verdict on behalf of an individual in the history of the United States. And in 2016 Bob Sweeney won the largest defamation of character verdict in the history of Illinois law. Eventually they essentially gave up as (according to Bob). "it was like trying a case before a rock, and a stupid one at that." And stupid is the kindest description that one can give to Judge Daniel Patrick Brennan as the alternative is an overtly corrupt judge. And just how dumb is Judge Brennan? He ruled that the Appellant Scott Foster needed to know the name of the PHH Mortgage representative who promised him forbearance in February/March 2010 and the exact date it was promised because Illinois law requires specificity with respect to pleading fraud.

3): But pursuant to Federal law, phone solicitors/representatives are not required to give one's name.

4): Therefore if one was truly required to supply the name of the phone representative in order to state a telephone fraud claim, there could not be a single telephone fraud claim in the United States of America.

5): This ruling is directly inapposite of what occurred before the United States Supreme court in the case of which case was argued in **Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600 (2003)** by the (truly) great Richard Huszagh of the Attorney General's Office of the State of Illinois. Mr. Huszagh has argued more cases on behalf on the Attorney General's Office before the Illinois Supreme Court than any other attorney with that office.

6): In **Illinois ex. rel. Madigan v Telemarketing**, the featured affidavit (that was commented on during oral argument as an example of fraud by Justices Souter, Scalia, and Rehnquist) and even made it into the unanimous opinion of Justice Ruth Bader Ginsburg was the affidavit of one Cynthia Lambert of Prospect Heights which affidavit did not even give the name of the telephone representative to whom she spoke. Furthermore, she only gave an approximation of one month as to the date when she spoke with the phone representative. So there is every member of the United States Supreme Court. (I can if needed supply the actual oral argument transcripts) looking at an affidavit that does not even have the name of the person to whom she spoke and still calling it a fraud and an intellectual pygmy like Daniel Brennan (without any legal citation whatsoever) claiming that in Illinois one is required to know the name of the person to whom one spoke, when Federal law does not require one to give one's name.

$A-56$

7):     Foster will not only be seeking the Amicus Curiae of Mr. Huszagh but will also be seeking the amici curiae of legitimate responsible organizations such as any number of types of phone solicitation companies as Judge Brennan's ruling has catastrophic consequences for hundreds of millions of Americans.

8):     But as bad as this ruling is, it is Daniel Patrick Brennan's second doofus like ruling that eviscerates "black iron law" as it pertains to summary judgment.

9):     As all justices on this panel know (as well as any first year law student and everybody else in between knows) summary judgment is granted where the outcome is "obvious"

10):    Yet in this instance, the Appellee PHH Mortgage presented two different sets of explanations for the same set of entries/numbers on the same ledger (with the first explanation clearly being the correct explanation, except that it substantiated Foster's defense and counterclaim. These explanations came almost THREE years apart

11):    Thus, there is no possible way summary judgment could have been granted in this matter.

**12):    Moreover, PHH should be held accountable for its actions in this matter as to why it took almost five years to present its motion for sale of the property, and why only when it did present its motion for the sale did it first present the exculpatory evidence/evidence supportive of a counterclaim that Foster had long before sought in discovery. Indeed, how would it be possible for PHH to object to this extension request given this delay of five years, which (absent a bankruptcy filing) is almost certainly the longest time to take to file for a sale date in the nearly 100,000 foreclosure filings during the past twelve years in Cook County. The reason for this delay of course is that the scum at PHH knew that is was pursuing a dirty claim and it wanted to minimize collateral damages from other defendants/claimants.**

13):    Indeed, PHH is a very dirty lender/loan originator as witnessed by its recent settlement of a False Claim Act (Lincoln Law) claim of $74 million on August 8th, 2017, which is a huge amount for such a tiny company that has a current market cap of $342 million dollars and recently sold its servicing rights for Coldwell Banker and Century 21 to Guaranteed Rate, because it could no longer could keep a portion of its business because of its troubles with the United States Government via the FHA fraud complained of in this matter. Indeed, it is very possible that by the time this matter is resolved in Foster's favor that there may not be any carcass of PHH from which Foster can get reimbursement

14):    Indeed, Foster has for review before the United States Department of Justice an FCA claim pertaining to PHH's conduct in this matter. (And while typically, the filings in such a matter are done under seal, there is simply no way that PHH can hide its conduct in this matter, so Foster has had no concerns revealing his filing in this matter. Simply put. PHH is a filthy dirty company.)

A-57

15):     This honorable court first granted Appellant an extension to file his initial brief within thirty five days on February 28, 2018.

16):     It was ordered despite the Appellant's request for 60 days.

17):     Most importantly, the Appellant was in an auto accident.

18):     As a result, the Appellant was not only injured, but he sustained $1800 damage to the car he was driving as well as missed eight days of word. Given that the appellant is currently driving for Uber (with an outstanding passenger rating of his work of 4.96), and he has had over 3000 shared ride trips it is likely that he would have netted an additional $2000 in income given that the eight days he missed.

19):     That Foster is now driving for Uber full time speaks to the enormous damages he has sustained as the direct result of the scum at PHH having done what they have done. Truly, the collateral financial consequences of their criminal behavior are staggering. It is now coming up to eight years of living hell that the scum off PHH have put Foster and his family through including in small part precipitating the death of Foster's late wife

20):     And a written "offer" of PHH's lawyer speaks to just how dirty PHH is. Specifically, their law firm has offered to go to PHH and see if the entire debt that PHH claims it is owed can be forgiven. For the attorneys for PHH to suggest that the letter offering to see if the debt can be forgiven was written without the approval of PHH is tooth fairy material. Nevertheless, there is simply no way that Foster would even consider for one second such a suggestion, which is even more disgraceful given that the money that is allegedly owed is ultimately owed to Fannie Mae. And make no mistake about it, Foster is deeply at risk financially as he will eventually receive two large insurance payments that are more than the money claimed owed by PHH. And of course, Foster's counterclaims were dismissed by (at best) goofy Judge Brennan. Furthermore, PHH is well aware that in his work as a real estate broker, Foster has had a sub specialty that was profoundly at odds with PHH's goals of foreclosing upon its victims as easily and quickly as possible. Specifically, Foster has had over one hundred short sales that were successful wherein a sale date for the property had just been set, subsequent to which Foster would solicit the short sale listing of these people, and Foster would get an offer for the property. Foster would then turn the legal file over to Attorney Charles Holley who is not just a former Counsel to the Coalition of African American Alderman, but who previously was part of the team that fought some 25 years ago against a truly egregious ward remap that deeply harmed the African American Community. Moreover, Mr. Holley was one of the lawyers who settled the 37 year old Shakman case that pertained to City of Chicago hiring practices. Unfortunately, Foster (and Mr Holley) could not do near as many short sales as they would have wanted (and initially tried) in the poorer African American neighborhoods because of the unfairly high taxes on these properties, which in turn led all lenders (including the clowns at PHH) to reject absolutely fair short sale offers in neighborhoods such as Fuller Park, Englewood, Auburn Gresham, Burnside, Calumet Heights, Greater Grand Crossings, etc. because the algorithms of sites such as Zillow gave higher estimates of value based upon these inflated taxes. In turn, Foster is now working with the law firm that is suing on this issued to provide a solid

A-58

analysis of just how badly the lazy and dirty clowns at PHH have harmed residents in the poorer neighborhoods of Chicago. This is not only a dirty "lender". This is a dirty law firm that is about to get hit in federal court with a FDCPA claim, leaving them to explain to a federal judge why it took them the above mentioned five years to come clean.

22     It is imperative for this court to know that while the Appellant is truly grateful that Uber and Lyft have become major entities in Chicago's transportation network, he still needs to work at least 70 hours a week to break even on his expenses as he has thirteen year old daughter to support as a single parent and other significant expenses. Not only that, but Foster home schools his daughter who was born with cerebral palsy and who was bullied in her school because she was clumsy. Therefore, Foster will not be able to retain any attorney to write his initial brief because of the losses from his accident as well as a $25,000 insurance claim not being yet paid to Foster. A second problem occurred when the charging port on his computer broke, and it took over a week to get it repaired.

23.     That does not present as much a challenge as it may seem as Foster has written/composed other legal briefs in other cases and has done an excellent job.

24.     Moreover, Foster will have his writings reviewed by two old dear friends both of whom have not only been lawyers for over 40 years, but who are deeply respected in their areas of law. (One is a law professor whom Foster has known since May 1968, and the other is an attorney who is truly a top biller with one of the truly great law firms in Chicago. Foster has known him since September 1969.

25.     The reason Foster seeks the specific date of May 2, 2018 is because Foster will only be able to pay for all needed expenses pertaining to this matter (including his taking time off to finish the brief) as of Wednesday, April 25, which is when he collects his social security check of $650 a month that is being paid through his late wife's account. (Foster is paying into his social security account until he is seventy so that he can max out the funds he receive.) This court is advised that payment of social security checks are on the fourth Wednesday of the month. In turn, this gives Foster one week to finish the brief.

Wherefore, Appellant Scott Foster asks that this honorable court grant him until May 2, 2018 to file his initial brief in the above matter, wherein no further extensions will be given.

Respectfully Submitted

Scott R Foster

4/2/2018

Date

A-59

Scott R Foster

5990 North Ridge

Chicago, Illinois 60660

312 485 9800

scottfostergvc@gmail.com

A-60

123950

This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Appellate Courts.

| Instructions ▼ | ☐ THIS APPEAL INVOLVES A QUESTION OF CHILD CUSTODY, ALLOCATION OF PARENTAL RESPONSIBILITIES, ADOPTION, TERMINATION OF PARENTAL RIGHTS, OR OTHER MATTER AFFECTING THE BEST INTEREST OF THE CHILD. |
|---|---|

Use white paper for this cover page.

Check the box to the right if applicable.

Enter the Appellate Court case number.

Just below "In the Appellate Court of Illinois," enter the number of the appellate district where the appeal was filed.

Enter the names of the parties as they appear on the trial court order being appealed.

The person who filed the appeal is the "appellant" and the person responding to the appeal is the "appellee." Check the correct box for each person.

To the far right, enter the trial court county, trial court case number, and trial judge's name.

Appellate Case No.:

## IN THE APPELLATE COURT OF
## ILLINOIS

**First District** District

Scott R. Foster
Plaintiff/Petitioner *(First, middle, last names)*

☒ Appellant    ☐ Appellee

v.

PNN Mortgage
Defendant/Respondent *(First, middle, last names)*

☐ Appellant    ☒ Appellee

Appeal from the Circuit Court
of **Cook** County

Trial Court Case No.: **10 CH 9803 1**

Honorable
Judge, Presiding

See *How To Prepare and File a Proof of Service & Affidavit of Mailing* for the difference between *Proof of Service* and *Affidavit of Mailing.*

In 1, fill in the name of the document you are sending to the other parties.

In 2, fill in the date you are sending the document to the other parties.

In 3, fill in the time you are sending the document to the other parties.

In 4, fill in the full name and address of the party or lawyer to whom you are sending the document and check the box to show how you are sending it.

## PROOF OF SERVICE & AFFIDAVIT OF
## MAILING (APPEAL)

### PROOF OF SERVICE TO THE PARTIES

1. I am sending the ___Motion For Extension___

2. On: __4/2__ , 20 __18__
   Date

3. At: __4.00__    ☐ a.m. ☒ p.m.
   Time

4. To:
   Name: __Joe__ __Nerbas__ __Esq. Shapiro Kreisman__
          First    Middle         Last

   Address: __20 N La Salle, Suite 2940 Chicago, Ill 60601__
            Street, Apt #              City        State  ZIP

   By: ☒ Personal hand delivery
       ☐ Regular, First-Class Mail, deposited into the U.S. Mail with postage paid at:

   _____
   Address of Post Office or Mailbox

PSA-A 1603.2
Page 1 of 3
(11/16)

A-61

Enter the Case Number given by the Appellate Court Clerk `1-17-2170`

☐ Third-party commercial carrier, delivered to:

*Name (for example, FedEx or UPS ) and office address*

☐ Email

Sender's address: _____ @

Recipient's address: _____ @

☐ Fax

Sender's number: _____

Recipient's number: _____

☐ Mail from a correctional institution, deposited into:

*Place of deposit into institutional mail*

**CAUTION: You may send this document by email or fax only if the other party has agreed to receive documents in the lawsuit by email or fax.**

---

**If there is a second party or lawyer to send the document to, fill in their name and address here and check the box to show how you are sending it.**

To:
Name: _____
*First*          *Middle*          *Last*

Address: _____
*Street, Apt #*          *City*          *State*     *ZIP*

By:
☐ Personal hand delivery
☐ Regular, First-Class Mail, deposited into the U.S. Mail with postage paid at:

*Address of Post Office or Mailbox*

☐ Third-party commercial carrier, delivered to:

*Name (for example, FedEx or UPS ) and office address*

☐ Email

Sender's address: _____

Recipient's address: _____ @

☐ Fax

Sender's number: _____

Recipient's number: _____

☐ Mail from a correctional institution, deposited into:

*Place of deposit into institutional mail*

**If there are more than 2 parties or lawyers to whom you must send the document, fill out and attach an *Additional Service List* and check to box.**

☐ I have listed additional parties or lawyers on the attached *Additional Service List* form.

---

**Stop!**

Fill out the *Affidavit of Mailing* only if you are filing the document with the court clerk by U.S. Mail or third-party commercial carrier.

In 5. fill in the name of the document you are sending to the court clerk's office for filing.

## AFFIDAVIT OF MAILING TO THE COURT

**Fill in sections 5-9 only if you are filing the document with the court clerk by U.S. Mail or third-party commercial carrier**

5. I filed the _____

SUBMITTED - 2289486 - Scott Foster - 9/21/2018 12:15 PM

123950

Enter the Case Number given by the Appellate Court Clerk: _____

| | |
|---|---|
| In 6, fill in the date you are depositing the document in the U.S. Mail, or giving the document to a third-party commercial carrier, or depositing the document into institutional mail. | **6.** On: _____ , 20 _____ <br> *Date* <br> **7.** At: _____ ☐ a.m. ☐ p.m. <br> *Time* |
| In 7, fill in the time you are depositing the document in the U.S. Mail, or giving the document to a third-party commercial carrier, or depositing the document into institutional mail. | **8.** By: ☐ Regular, First-Class Mail, deposited into the U.S. Mail with postage paid at: <br> _____ <br> *Address of Post Office or Mailbox* <br> ☐ Third-party commercial carrier, delivered to: <br> _____ <br> *Name (for example, FedEx or UPS) and office address* <br> ☐ Mail from a correctional institution, deposited into: |
| In 8, check the method you are using to send the document to the court clerk's office for filing. | _____ <br> *Place of deposit into institutional mail* |
| In 9, fill in the court's name and the address of the court clerk's office where you are sending the document for filing. | **9.** To: <br> Clerk of the _____ <br> *Name of Court* <br> Address of Clerk's Office: _____ <br> *Street*     *City*     *State*     *ZIP* |

**CERTIFICATION**

| | |
|---|---|
| Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony. | I certify that everything in the *Proof Of Service & Affidavit Of Mailing (Appeal)* is true and correct. I understand that making a false statement on this form is perjury and has penalties provided by law under 735 ILCS 5/1-109. |
| After you finish this form, sign and print your name. | _Scott P. Foster_     5990 North Ridge <br> *Your Signature*     *Street Address* <br> _Scott P. Foster_     Chicago, Ill 60660 <br> *Print Your Name*     *City, State, ZIP* |
| Enter your complete current address and telephone number. | 312-495-9800 <br> *Telephone* |

SUBMITTED - 2289486 - Scott Foster - 9/21/2018 12:15 PM

# Exhibit 2



## SUPREME COURT OF ILLINOIS
SUPREME COURT BUILDING
200 East Capitol Avenue
SPRINGFIELD, ILLINOIS 62701-1721
(217) 782-2035

FIRST DISTRICT OFFICE
160 North LaSalle Street, 20th Floor
Chicago, IL 60601-3103
(312) 793-1332
TDD: (312) 793-6185

November 28, 2018

In re:   PHH Mortgage Corporation, respondent, v. Scott R. Foster,
petitioner. Leave to appeal, Appellate Court, First District.
123950

The Supreme Court today DENIED the Petition for Leave to Appeal in the above
entitled cause.

The mandate of this Court will issue to the Appellate Court on 01/02/2019.

Neville, J., took no part.

Very truly yours,

*Carolyn Taft Grosboll*

Clerk of the Supreme Court

Exhibit 3

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISON

| | | |
|---|---|---|
| In re Scott R Foster | ) | |
| Plaintiff/Petitioner | ) | Case Number |
| V | ) | |
| Illinois Appellate Court First District Second | ) | |
| Division Justices Mary Anne | ) | |
| Mason, Aurelia Pucinski, Michael B Hyman | ) | |

**Affidavit**

I Scott R Foster on oath affirm that:

1):     Currently there are extraordinary circumstances, which revolve around the very hell hole
of a life that both I and my 15 year old daughter live daily as the direct result of my having had
the integrity to fight what was clearly an illegal foreclosure on what was perhaps the nicest single
floor condo in all of Rogers Park that was on perhaps the nicest cul de sac street in Rogers Park
and was truly a mere 200 feet from the edge of Lake Michigan wherein I had approximately
$150,000 in equity given the value of my property and the amount on my mortgage.

2):     Between  working as an independent contractor for Uber and working on legal issues, I
have not had a day off since February 2018 a full eighteen months ago. Moreover, I have not had
a single day of vacation since just after my late wife first got cancer in 2007. (She passed on
April 15, 2011)

3):     I continually struggle with health issues that often arise at my age (68), which result from lack of exercise, the deep physical burden of driving (counting off line driving time that results from getting back into prime pick up areas) a full sixty hours a week, (which is the federal maximum for truck drivers). In particular I rent a Toyota Prius, which is not only small and leads to me be cramped in the car but has poor shock absorbers. So for sixty hours a week, my body is constantly being jarred by various potholes with the exception of driving on the local Interstates and the north parts of Western Avenue and Ashland Avenue in Chicago as well as Michigan Avenue and some suburbs, most notably Evanston and Mount Prospect.

4):     In addition I am the single father of a fifteen year old child who is home schooled who is a true genius and who is currently taking classes online from Arizona State University, which tuition is paid for by Uber, which makes this payment because I am easily in the highest category (Diamond) of Uber Drivers, and I have driven well over the required 3000 trips. Most significantly, I have not even taken an hour of my time in the past three years to do something for myself in as little as an hour with the exception of getting a haircut and of course walking.

5): To give this court an idea of our struggles, please consider the following parts of my/our life: Only five months ago did I have the money to buy eye glasses to drive despite the fact that my vision is 20/40. At about the same time I bought a small refrigerator for out motel room, which allows us to eat healthier foods including the Whole Foods organics that my child grew up on. When we were at the peak of our homelessness, we had one small single leather suitcase that we used. Now primarily through the "Share Shop" at Fourth Presbyterian Church, my daughter and I both have four sets of clothes. The only items we have bought are underwear and socks. I also have always made sure that my daughter's health needs are addressed including immunizations.

6):    Moreover, there are currently four other active law suits that I have filed that pertain to this illegal foreclosure with a fifth on the way, (although by that time one of the four active lawsuits will most likely be resolved.). Indeed. In the past three months I have filed two law suits in the Circuit Court of Cook County where I paid both my filing fees, and I needed to pay for sheriffs service for a total of $2000. Both of these law suits were up against statute of limitation issues so the time and money for these cases superseded this matter. Both of these law suits resulted directly from the core issue of the illegal foreclosure.

7):    The court is further advised that about a year ago, I was working on a project for a real estate attorney wherein I was responsible for getting the lawyer more business through internet solicitations, As a result, I set aside my driving for Uber by the beginning of May, and I soon began to exercise to the extent that by September I was walking ten miles a day, which is exactly what I needed to do in order to stave off becoming diabetic. And I lost 25 pounds. But in September of last year, my circumstances again changed, and I began to drive for Uber again. And once again, I feel the same feeling of fatigue and an onset of the same symptoms that I experienced before. But I am very close to collecting a $25,000 insurance claim, and I am also very close to signing a lease for an apartment in Evanston for a two bedroom for $1400 a month, wherein I will not be required to put down a deposit or provide a credit check as the landlord is an old real estate client of mine. So once again, I feel as if I will be "dodging a bullet"

8): The net result of this is that I simply have not had either the time or the money to file this writ of mandamus until this very day.

Further affiant sayeth not.

_Scott R Foster_ (signature)

Scott R Foster

7/26/2019

Date

11-16-20.

My commission expires

Subscribed and sworn to before me
This \_\_26th\_\_ Day of \_\_July\_\_ 20\_\_19\_\_
at Chicago, County of Cook, State of Illinois

Notary Public _____

MOHAMMED SABIR JUNAGADHWALA
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 16, 2022